# EXHIBIT 1

**SUMMONS - CIVIL**
JD-CV-1  Rev. 2-20
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

| For information on ADA accommodations, contact a court clerk or go to: *www.jud.ct.gov/ADA*. |
| --- |

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*


**Instructions are on page 2.**

☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.

☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.

☐ Select if claiming other relief in addition to, or in place of, money or damages.

**TO: Any proper officer**
By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk (Number, street, town and zip code) | Telephone number of clerk | Return Date (Must be a Tuesday) |
| --- | --- | --- |
| 146 White Street, Danbury, CT 06810 | ( 203 ) 207 - 8600 | 08/30/2022 |

| ☒ Judicial District | ☐ Housing Session | ☐ G.A. Number: | At (City/Town) DANBURY | Case type code (See list on page 2) Major: T   Minor: 20 |
| --- | --- | --- | --- | --- |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented (Number, street, town and zip code) IZARD, KINDALL & RAABE, LLP, 29 South Main Street, Suite 305, West Hartford, CT 06107 | Juris number (if attorney or law firm) 410725 |
| --- | --- |

| Telephone number ( 860 ) 493 - 6292 | Signature of plaintiff (if self-represented) |
| --- | --- |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. ☒ Yes ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book (if agreed) craabe@ikrlaw.com |
| --- | --- |

| Parties | | Name (Last, First, Middle Initial) and address of each party (Number; street; P.O. Box; town; state; zip; country, if not USA) | |
| --- | --- | --- | --- |
| First plaintiff | Name: | BACHER, Beth, Plaintiff Representative for PAUL BACHER (DECEASED) | P-01 |
| | Address: | 118 Lakeshore Dr, Ashbumham MA, 01420 | |
| Additional plaintiff | Name: | (see attached) | P-02 |
| | Address: | | |
| First defendant | Name: | BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., 900 Ridgebury Rd, Ridgefield, CT 06877 | D-01 |
| | Address: | c/o Agent for Service, CT Corporation System, 67 Burnside Ave, East Hartford, CT 06108 | |
| Additional defendant | Name: | BOEHRINGER INGELHEIM CORP., 900 Ridgebury Rd, Ridgefield, CT 06877 | D-02 |
| | Address: | c/o Agent for Service, CT Corporation System, 67 Burnside Ave, East Hartford, CT 06108 | |
| Additional defendant | Name: | BOEHRINGER INGELHEIM USA CORP., 900 Ridgebury Rd, Ridgefield, CT 06877 | D-03 |
| | Address: | c/o Agent for Service, CT Corporation System, 67 Burnside Ave, East Hartford, CT 06108 | |
| Additional defendant | Name: | GLAXOSMITHKLINE, LLC, 5 Crescent Drive, Philadelphia, PA, 19112 | D-04 |
| | Address: | c/o Agent for Service, CORPORATION SERVICE CO., 225 Asylum St., 20th Floor, Hartford, CT 06103 | |

| Total number of plaintiffs: 99 | Total number of defendants: 8 | ☒ Form JD-CV-2 attached for additional parties |
| --- | --- | --- |

## Notice to each defendant

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.
2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.
3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.
4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.
5. If you have questions about the summons and complaint, you should talk to an attorney.
The court staff is not allowed to give advice on legal matters.

| Date 07/29/2022 | Signed (Sign and select proper box) | ☒ Commissioner of Superior Court ☐ Clerk | Name of person signing Robert A. Izard |
| --- | --- | --- | --- |

If this summons is signed by a Clerk:

a. The signing has been done so that the plaintiff(s) will not be denied access to the courts.
b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law.
c. The court staff is not permitted to give any legal advice in connection with any lawsuit.
d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint.

| For Court Use Only |
| --- |
| File Date |

A TRUE COPY ATTEST

KEITH D. NIZIANKIEWICZ
CONNECTICUT STATE MARSHAL
INDIFFERENT PERSON

| I certify I have read and understand the above: | Signed (Self-represented plaintiff) | Date | Docket Number |
| --- | --- | --- | --- |

## Instructions

1. Type or print legibly. If you are a self-represented party, this summons must be signed by a clerk of the court.
2. If there is more than one defendant, make a copy of the summons for each additional defendant. Each defendant must receive a copy of this summons. Each copy of the summons must show who signed the summons and when it was signed. If there are more than two plaintiffs or more than four defendants, complete the Civil Summons Continuation of Parties (form JD-CV-2) and attach it to the original and all copies of the summons.
3. Attach the summons to the complaint, and attach a copy of the summons to each copy of the complaint. Include a copy of the Civil Summons Continuation of Parties form, if applicable.
4. After service has been made by a proper officer, file the original papers and the officer's return of service with the clerk of the court.
5. Use this summons for the case type codes shown below.

Do not use this summons for the following actions:

(a) Family matters (for example divorce, child support, custody, paternity, and visitation matters)

(b) Any actions or proceedings in which an attachment, garnishment or replevy is sought

(c) Applications for change of name

(d) Probate appeals

(e) Administrative appeals

(f) Proceedings pertaining to arbitration

(g) Summary Process (Eviction) actions

(h) Entry and Detainer proceedings

(i) Housing Code Enforcement actions

## Case Type Codes

| MAJOR DESCRIPTION | CODE Major/Minor | MINOR DESCRIPTION | MAJOR DESCRIPTION | CODE Major/Minor | MINOR DESCRIPTION |
|---|---|---|---|---|---|
| Contracts | C 00 | Construction - All other | Property | P 00 | Foreclosure |
| | C 10 | Construction - State and Local | | P 10 | Partition |
| | C 20 | Insurance Policy | | P 20 | Quiet Title/Discharge of Mortgage or Lien |
| | C 30 | Specific Performance | | P 30 | Asset Forfeiture |
| | C 40 | Collections | | P 90 | All other |
| | C 50 | Uninsured/Underinsured Motorist Coverage | Torts (Other than Vehicular) | T 02 | Defective Premises - Private - Snow or Ice |
| | C 60 | Uniform Limited Liability Company Act – C.G.S. 34-243 | | T 03 | Defective Premises - Private - Other |
| | C 90 | All other | | T 11 | Defective Premises - Public - Snow or Ice |
| Eminent Domain | E 00 | State Highway Condemnation | | T 12 | Defective Premises - Public - Other |
| | E 10 | Redevelopment Condemnation | | T 20 | Products Liability - Other than Vehicular |
| | E 20 | Other State or Municipal Agencies | | T 28 | Malpractice - Medical |
| | E 30 | Public Utilities & Gas Transmission Companies | | T 29 | Malpractice - Legal |
| | E 90 | All other | | T 30 | Malpractice - All other |
| Housing | H 10 | Housing - Return of Security Deposit | | T 40 | Assault and Battery |
| | H 12 | Housing - Rent and/or Damages | | T 50 | Defamation |
| | H 40 | Housing - Housing - Audita Querela/Injunction | | T 61 | Animals - Dog |
| | H 50 | Housing - Administrative Appeal | | T 69 | Animals - Other |
| | H 60 | Housing - Municipal Enforcement | | T 70 | False Arrest |
| | H 90 | Housing - All Other | | T 71 | Fire Damage |
| Miscellaneous | M 00 | Injunction | | T 90 | All other |
| | M 10 | Receivership | Vehicular Torts | V 01 | Motor Vehicles* - Driver and/or Passenger(s) vs. Driver(s) |
| | M 15 | Receivership for Abandoned/Blighted Property | | V 04 | Motor Vehicles* - Pedestrian vs. Driver |
| | M 20 | Mandamus | | V 05 | Motor Vehicles* - Property Damage only |
| | M 30 | Habeas Corpus (extradition, release from Penal Institution) | | V 06 | Motor Vehicle* - Products Liability Including Warranty |
| | M 40 | Arbitration | | V 09 | Motor Vehicle* - All other |
| | M 50 | Declaratory Judgment | | V 10 | Boats |
| | M 63 | Bar Discipline | | V 20 | Airplanes |
| | M 66 | Department of Labor Unemployment Compensation Enforcement | | V 30 | Railroads |
| | | | | V 40 | Snowmobiles |
| | M 68 | Bar Discipline - Inactive Status | | V 90 | All other |
| | M 70 | Municipal Ordinance and Regulation Enforcement | | | *Motor Vehicles include cars, trucks, motorcycles, and motor scooters. |
| | M 80 | Foreign Civil Judgments - C.G.S. 52-604 & C.G.S. 50a-30 | Wills, Estates and Trusts | W 10 | Construction of Wills and Trusts |
| | M 83 | Small Claims Transfer to Regular Docket | | W 90 | All other |
| | M 84 | Foreign Protective Order | | | |
| | M 89 | CHRO Action in the Public Interest - P.A. 19-93 | | | |
| | M 90 | All other | | | |

**CIVIL SUMMONS**
**CONTINUATION OF PARTIES**
JD-CV-2    Rev. 9-12

STATE OF CONNECTICUT
SUPERIOR COURT

First named Plaintiff *(Last, First, Middle Initial)*
BACHER, Beth, plaintiff representative for Paul Bacher (deceased)

First named Defendant *(Last, First, Middle Initial)*
BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)*    Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|
| ATKINS, Asha  2415 Georgina Falls Dr., Spring, TX  77373 | 03 |
| BALDWIN, Anthony  P.O. Box 851, Sutherlin, OR  97479 | 04 |
| BANKS, LaShaunna Denise  195 Chatham PL #4, Winchester, KY  40391 | 05 |
| BAPTISTA, Niema  385 Palm Avenue, Apt 2-A, Oakland, CA  94610 | 06 |
| BATISTE, Calanthe  3520 Burke Rd, #124, Pasadena, TX  77504 | 07 |
| BEHRENS, Jason  3125 Arches Bluff Circle, Lancaster, SC  29720 | 08 |
| BELLARD, Chasity  305 W. Commerce St., #402, Dallas, TX  75208 | 09 |
| BLAKE, Jesse  6038 W. 26th St., Apt #108, Cicero, IL  60804 | 10 |
| BLOCK, William  37 Estates Rd., Apt #59, Cherryfield, ME 04622 | 11 |
| BOLEN, Jeffrey  4085 Bedaki Ave NE, Lowell, MI 49331 | 12 |
| BROPHY, Sr., Christopher  1950 Haven Lane, Dunkirk, MD 20754 | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)*    Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|
| GLAXOSMITHKLINE HOLDINGS (AMERICAS) INC., 1105 N. Market Street, Suite 622, Wilmington, DE 19801 c/o Agent for Service, Wilmington Trust SP Services, Inc., 1100 N. Market St., 4th Floor, Wilmington, DE 19890 | 05 |
| PFIZER, INC., 235 East 42nd Street, New York, NY 10017 c/o Agent for Service, CT Corp. System, 67 Burnside Avenue, East Hartford, CT 06108-3408 | 06 |
| SANOFI-AVENTIS U.S. LLC, 55 Corporate Drive, Bridgewater, NJ 08807 c/o Agent for Service, Corporation Service Co., 251 Little Falls Drive, Wilmington, DE 19808 | 07 |
| SANOFI U.S. SERVICES, INC., 55 Corporate Drive, Bridgewater, NJ 08807 c/o Agent for Service, Corporation Service Co., 251 Little Falls Drive, Wilmington, DE 19808 | 08 |
|  | 09 |
|  | 10 |
|  | 11 |
|  | 12 |
|  | 13 |
|  | 14 |

*FOR COURT USE ONLY - File Date*

Docket number

CIVIL SUMMONS-Continuation

**CIVIL SUMMONS**
CONTINUATION OF PARTIES
JD-CV-2   Rev. 9-12

STATE OF CONNECTICUT
SUPERIOR COURT

First named Plaintiff *(Last, First, Middle Initial)*
BACHER, Beth, plaintiff representative for Paul Bacher (deceased)

First named Defendant *(Last, First, Middle Initial)*
BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| BUNDAGE, Kenishia  5318 Madden Lane, Houston, TX 77048 | | 03 |
| CALHOUN, Maurice  4610 Botticelli Ct., Antioch, CA 94509 | | 04 |
| CHAMBERLAIN, Sonja  1712 West 12th Street, Apt. #27, Sioux Falls, SD 57104 | | 05 |
| CHAMPINE, Stephen  2700 South Memorial Dr., Apt# A4, Green Bay, WI 54313 | | 06 |
| CHARLES, Lindsey  5457 Chamberlain Street, Antioch, CA 94531 | | 07 |
| CHOUINARD, Douglas  917 13th St.,  Apt A, Cody, WY 82414 | | 08 |
| CLEM, Billie Jo  3902 Happy Valley Rd,, Keezletown, VA 22832 | | 09 |
| COLLINS, Ron Mazun  504 E. 2nd St., Apt. 6,, Black River Falls, WI 54615 | | 10 |
| CONWAY, Chauncey  1425 w. 78th st. South 805, Tulsa, OK 74132 | | 11 |
| COUCHIE, Florence  559 Broadway St,, Middleport, OH 45760 | | 12 |
| DAU, Trina 12111 2nd Dr. SE,, Everett, WA 98208 | | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | | 12 |
| | | 13 |
| | | 14 |

*FOR COURT USE ONLY - File Date*

Docket number

CIVIL SUMMONS-Continuation

**CIVIL SUMMONS**
**CONTINUATION OF PARTIES**
JD-CV-2     Rev. 9-12

STATE OF CONNECTICUT
SUPERIOR COURT

First named Plaintiff *(Last, First, Middle Initial)*
BACHER, Beth, plaintiff representative for Paul Bacher (deceased)

First named Defendant *(Last, First, Middle Initial)*
BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| DAVIS, Kenneth  116 West Indigo Street, Compton, CA 90220 | | 03 |
| DEFRANG, Roger A.  2200 Shady View Ct., Arlington, TX 76013 | | 04 |
| DELANEY, Rusty  Farris Rd 132, Jonesville, LA 71343 | | 05 |
| DERCKS, Randy  1805 Glenview Ave., Kaukauna, WI 54130 | | 06 |
| DONES, Alvester  328 Highmarket St., Georgetown, SC 29440 | | 07 |
| DOTSON, Chastity  5607 Lake Jackson Drive, Waco, TX 76710 | | 08 |
| DOTY, Horace  1011 Durant St, , Lansing, MI 48915 | | 09 |
| DOUCET, Teddy  31535 Highway 75, Plaquemine, LA 70764 | | 10 |
| DREWERY, Detric  P.O. Box 31614, Houston, TX 77231 | | 11 |
| DUGDALE, Connie  4882 Lancaster Drive Northeast, Unit 72, Salem, OR 97305 | | 12 |
| DUGGER, Harris  9340 Carnes Crossing Cir., Jonesboro, GA 30236 | | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | | 12 |
| | | 13 |
| | | 14 |

FOR COURT USE ONLY - File Date

Docket number

CIVIL SUMMONS-Continuation

**CIVIL SUMMONS**
**CONTINUATION OF PARTIES**
JD-CV-2    Rev. 9-12

STATE OF CONNECTICUT
SUPERIOR COURT

First named Plaintiff *(Last, First, Middle Initial)*
BACHER, Beth, plaintiff representative for Paul Bacher (deceased)

First named Defendant *(Last, First, Middle Initial)*
BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| DUTYE; Tantasha  2518 Best Ave., Oakland, CA 94601 | | 03 |
| EDWARDS, Laura  3574 E.Main St., Whitehall, OH 43213 | | 04 |
| EISCHEN, Lori A. 8015 North Wayne Ave, , Kansas City, MO 64118 | | 05 |
| EKLUND, Cindy  376 Tunk Lake Road, Sullivan, ME 04664 | | 06 |
| ELLIS, Laura  2451 Glenngarry Rd,, Jackson MI 49203 | | 07 |
| ENLOE, Darrell  11 Palmer School Ln., Silex, MO 63377 | | 08 |
| EVANS, Lillie  601 North Walnut Ave., Apt. 202, Freeport, IL 61032 | | 09 |
| FERGUSON, Austin  680 W Sam Houston Pkwy S., Apt 3322, Houston, TX 77042 | | 10 |
| FIELDS, Dollie  200 Whitfield Drive, Goldsboro, NC 27530 | | 11 |
| FISHER, William L.  9721 Billburns Road, , Emmett, ID 83617 | | 12 |
| FIVECOAIT, Kevin Herbert Kay  705 Barrett South Rd., Vincent, OH 45784 | | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | 12 | FOR COURT USE ONLY - File Date |
| | 13 | |
| | 14 | Docket number |

CIVIL SUMMONS-Continuation

# CIVIL SUMMONS
## CONTINUATION OF PARTIES
JD-CV-2   Rev. 9-12

STATE OF CONNECTICUT
SUPERIOR COURT



First named Plaintiff *(Last, First, Middle Initial)*

**BACHER, Beth, plaintiff representative for Paul Bacher (deceased)**

First named Defendant *(Last, First, Middle Initial)*

**BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.**

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)*   Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|
| FLUESMEIER, Paul  997 South East 331st Road, Deepwater, MO 64740 | 03 |
| FORREST, Edward L.  4504 Hickory Rd. Apt 1B, Mishawaka, IN 46545 | 04 |
| FRANCIS, Leah  6018 Pinacle Point, Houston, TX 77085 | 05 |
| FRANCIS, Viola  8565 W. Sam Houston Pkwy. S, Houston, TX 77072 | 06 |
| FRANKLIN, Mark  17033 Butte Creek Road, #1704, Houston, TX 77090 | 07 |
| FREDERICK, Tamara  1000 Blythwood Place, #E90, Davenport, IA 52804 | 08 |
| FREEMAN, Celeste  19303 Quiet Brook Dr., Houston, TX 77084 | 09 |
| FROMMER, Robert  4600 Beechnut St,, Apt 110, Houston, TX 77096 | 10 |
| GAINES, Terrance 209 Cedar Ridge, Anderson, SC 29621 | 11 |
| GAINES, Traveon  1948 Kettle Rock Court, Antioch, CA 94531 | 12 |
| GALBERT, Ladoris  12431 North Garden Street, Houston, TX 77071 | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)*   Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|
| | 05 |
| | 06 |
| | 07 |
| | 08 |
| | 09 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |

FOR COURT USE ONLY - File Date

Docket number

CIVIL SUMMONS-Continuation

**CIVIL SUMMONS**
**CONTINUATION OF PARTIES**
JD-CV-2   Rev. 9-12

**STATE OF CONNECTICUT**
**SUPERIOR COURT**

First named Plaintiff *(Last, First, Middle Initial)*
BATCHER, Beth, plaintiff representative for Paul Batcher (deceased)
First named Defendant *(Last, First, Middle Initial)*
BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)*    Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|
| GARDNER, Robert  914 Center Street N, , Birmingham, AL 35204 | 03 |
| GILL, Linda  3042 West Eggert Place, Milwaukee, WI 53209 | 04 |
| GLIDDEN, Michael  4336 Carls Court, Chantilly, VA 20151 | 05 |
| GOINGS, John  8821 Hornaday Circle S., Apt 509, Forth Worth, TX 76120 | 06 |
| GOLDEN, Jason  3105 Oak Mountain Drive, , Clarksburg, WV 26301 | 07 |
| GOODMAN, Roy  5116 Alba Rd, Apt. #23, Houston, TX 77018 | 08 |
| GORHAM, Justin  901 13th Street SE, Apt. #204, Washington, DC 20032 | 09 |
| GRAHAM, Dale  4105 Kentucky Ave NW, Roanoke, VA 24017 | 10 |
| GREY, Calandra  1701 E Robert Street, Fort worth, TX 76104 | 11 |
| GUALTIERI, Mario  211 Cherry St,, Dallas City, IL 62330 | 12 |
| GUTIERREZ, Arnoldo  P.O. Box 864, Aspermont, TX 79502 | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)*    Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|
| | 05 |
| | 06 |
| | 07 |
| | 08 |
| | 09 |
| | 10 |
| | 11 |

| | | FOR COURT USE ONLY - File Date |
|---|---|---|
| | 12 | |
| | 13 | |
| | 14 | Docket number |

CIVIL SUMMONS-Continuation

CIVIL SUMMONS
CONTINUATION OF PARTIES
JD-CV-2   Rev. 9-12

STATE OF CONNECTICUT
SUPERIOR COURT



First named Plaintiff  *(Last, First, Middle Initial)*
BATCHER, Beth, plaintiff representative for Paul Batcher (deceased)

First named Defendant  *(Last, First, Middle Initial)*
BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)*                                                                          Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|
| HAGGERTY, Mildred  509 S Garfield St., Junction City, KS  66441 | 03 |
| HALL, Bryttny  565 Hank Aaron Drive SE, Atlanta, GA 30312 | 04 |
| HAMM, Della  706 2nd St W Scott City, Missouri 63780 | 05 |
| HAMPTON, Tremain  5261 Ledgewood Creek Ave., Las Vegas, NV 89141 | 06 |
| HANSANA, Zack  74 Thacher Circle, Sacramento CA 95823 | 07 |
| HARDY, Bridgette  6710 Lozier Street, Houston, TX 77021 | 08 |
| HARMAN, Robert 3428 Garry Rd, Bliss, NY 14024 | 09 |
| ADAMS, Joann, Plaintiff Rep for Robert E. Adams (DECEASED)  9203 Dayflower St., Prospect, KY 40059 | 10 |
| BAGACO, John, Plaintiff Rep for Joao Bagaco, (DECEASED), 3407 Boyne St, , Spring Valley, CA 91977 | 11 |
| BARAJAS, Ilene, Plaintiff Rep for Martin Barajas, (DECEASED), P.O. Box 717, Florissant, CO 80816 | 12 |
| DOYLE, Ricky, Plaintiff Rep for Anita Bennette, (DECEASED), 723 Monte Carlo Drive, Suisun, CA 94533 | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)*                                                                          Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|
| | 05 |
| | 06 |
| | 07 |
| | 08 |
| | 09 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |

FOR COURT USE ONLY - File Date

Docket number

CIVIL SUMMONS-Continuation

**CIVIL SUMMONS**
CONTINUATION OF PARTIES
JD-CV-2   Rev. 9-12

STATE OF CONNECTICUT
SUPERIOR COURT

First named Plaintiff  *(Last, First. Middle Initial)*
BATCHER, Beth, plaintiff representative for Paul Batcher (deceased)

First named Defendant  *(Last, First, Middle Initial)*
BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)* | Address  *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| BLEUER, Mark, Plaintiff Rep for KAREN BLEUER (DECEASED), 9388 Dodge Rd., Apt. #2, Otisville, MI 48463 | | 03 |
| RUDOLPH, Julie, Plaintiff Rep for ANDREW BOISVERT (DECEASED), 6502 Robin Drive, Gillette, WY 82718 | | 04 |
| BOOKER, Darla, Plaintiff Rep for DOUGLAS L. BOOKER (DECEASED), 3479 E Haile Street, Brookline, MO 65619 | | 05 |
| BUCCERI, Joseph, Plaintiff Rep for BARBARA BUCCERI (DECEASED), 10446 Shaft Surg Road, Lanesburg, MI 48848 | | 06 |
| CAHOON, Robbie, Plaintiff Rep for DUSTY CAHOON (DECEASED), 5102 Oregon Trail, Amarillo, TX 79109 | | 07 |
| DUBOSE, Shermecka, Plaintiff rep for PATRICIA COBB (DECEASED), 13843 Rampart Ct., Baton Rouge, LA 70810 | | 08 |
| GHOSIO, Teresa, Plaintiff Rep for  SUSAN CALLARI (DECEASED), 6187 North Country Rd, Wading River, NY 11792 | | 09 |
| CATO, Tracie, Plaintiff Rep for SANDRA CATO (DECEASED); 4432 Wrightsboro Rd., Apt. 6, Grovetown, GA 30813 | | 10 |
| CLARK, Forestine, Plaintiff rep for Edward Clark (DECEASED);2001 Greenpoint Dr., New Orleans LA 70094 | | 11 |
| CONTRERAS, Sonja, Plaintiff rep for Enrique Contreras (DECEASED); PO Box 557, Hayden, AZ 85134 | | 12 |
| CORTEZ-BATEMAN, Jacqueline, Plaintiff rep for William Cortez (DECEASED); 1891 N Cedar St., Holt, MI 48842 | | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)* | Address  *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | 12 | FOR COURT USE ONLY - File Date |
| | 13 | |
| | 14 | Docket number |

CIVIL SUMMONS-Continuation

**CIVIL SUMMONS**
CONTINUATION OF PARTIES
JD-CV-2    Rev. 9-12

STATE OF CONNECTICUT
SUPERIOR COURT



First named Plaintiff  (Last, First, Middle Initial)
BATCHER, Beth, plaintiff representative for Paul Batcher (deceased)

First named Defendant  (Last, First, Middle Initial)
BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.

## Additional Plaintiffs

| Name  (Last, First, Middle Initial, if individual) | Address  (Number, Street, Town and Zip Code) | CODE |
|---|---|---|
| CRISTINO, Nicholas, Plaintiff rep for Francis Cristino (DECEASED);5910 Deering Ave., Parma Heights, OH 44130 | | 03 |
| CURRIE, Aaron, Plaintiff rep for Bonita Currie (DECEASED); 1450 Clough St., Bowling Green, OH 43402 | | 04 |
| VERBACK, Susan, Plaintiff rep for Virginia Cwiakala (DECEASED); 1227 Washington St, Des Plaines, IL 60016 | | 05 |
| DAHL, Diane, Plaintiff rep for Michael A. Dahl, Sr. (DECEASED); 334 East Bradley St., Tyler, MN 56178 | | 06 |
| DASENT, Diane, Plaintiff rep for Mary Dasent (DECEASED); 95 Vassar Avenue 2nd Floor, , Newark, NJ 07112 | | 07 |
| YOBAK, Joanne, Plaintiff rep for Rita Jane Donohue (DECEASED); 140 Southbury Dr., Myrtle Beach, SC 29588 | | 08 |
| ECCLES, Thomas, Plaintiff rep for Patricia Eccles (DECEASED); 1162 Bramlage Rd, , Walton, KY 41094 | | 09 |
| DUGAS, Dana, Plaintiff rep for Bonnie Edwards (DECEASED); 11345 Falcon Perch Cir., Denham Springs, LA 70706 | | 10 |
| FEARS, Lillian, Plaintiff rep for Wayne Fears (DECEASED); 7600 Hawthorne Dr SW, Knoxville, TN 37919 | | 11 |
| RICHIE, Lisa, Plaintiff rep for Daniel Molz (DECEASED); 1010 G Street, Rogers, AR 72756 | | 12 |
| | | 13 |

## Additional Defendants

| Name  (Last, First, Middle Initial, if individual) | Address  (Number, Street, Town and Zip Code) | CODE |
|---|---|---|
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | 12 | FOR COURT USE ONLY - File Date |
| | 13 | |
| | 14 | Docket number |

CIVIL SUMMONS-Continuation

RETURN DATE: AUGUST 30, 2022

BETH BACHER, PLAINTIFF                     :     SUPERIOR COURT
REPRESENTATIVE FOR PAUL BACHER             :
(DECEASED); ASHA ATKINS; ANTHONY           :
BALDWIN; LASHAUNNA DENISE                   :     JUDICIAL DISTRICT OF DANBURY
BANKS; NIEMA BAPTISTA; CALANTHE             :
BATISTE; JASON BEHRENS; CHASITY             :
BELLARD; JESSE BLAKE; WILLIAM               :
BLOCK; JEFFREY BOLEN;                       :
CHRISTOPHER BROPHY, SR.; KENISHIA           :     JULY 29, 2022
BUNDAGE; MAURICE CALHOUN;                   :
SONJA CHAMBERLAIN; STEPHEN                  :
CHAMPINE; LINDSEY CHARLES;                  :
DOUGLAS CHOUINARD; BILLIE JO                :
CLEM; RON MAZUN COLLINS;                    :
CHAUNCEY CONWAY; FLORENCE                   :
COUCHIE; TRINA DAU; KENNETH                 :
DAVIS; ROGER ALLAN DEFRANG;                 :
RUSTY DELANEY; RANDY DERCKS;                :
ALVESTER DONES; CHASTITY                    :
DOTSON; HORACE DOTY; TEDDY                  :
DOUCET; DETRIC DREWERY; CONNIE              :
DUGDALE; HARRIS DUGGER;                     :
TANTASHA DUTYE; LAURA EDWARDS;              :
LORI A EISCHEN; CINDY EKLUND;               :
LAURA ELLIS; DARELL ENLOE; LILLIE           :
EVANS; AUSTIN FERGUSON; DOLLIE              :
FIELDS; WILLIAM LYNN FISHER;                :
KEVIN HERBERT KAY FIVECOAIT;                :
PAUL FLUESMEIER; EDWARD L                   :
FORREST; LEAH FRANCIS; VIOLA                :
FRANCIS; MARK FRANKLIN; TAMARA              :
FREDERICK; CELESTE FREEMAN;                 :
ROBERT FROMMER;                             :
TERRANCE GAINES; TRAVEON                    :
GAINES; LADORIS GALBERT; ROBERT             :
GARDNER; LINDA GILL; MICHAEL                :
GLIDDEN; JOHN GOINGS; JASON                 :
GOLDEN; ROY GOODMAN; JUSTIN                 :
GORHAM; DALE GRAHAM; CALANDRA               :
GREY; MARIO GUALTIERI; ARNOLDO              :
GUTIERREZ; MILDRED HAGGERTY;                :
BRYTTNY HALL; DELLA HAMM;                   :
TREMIAN HAMPTON; ZACK HANSANA;              :

BRIDGETTE HARDY; ROBERT          :
HARMAN;                          :
                                 :
JOANN ADAMS, PLAINTIFF           :
REPRESENTATIVE FOR ROBERT        :
EUGENE ADAMS (DECEASED);         :
                                 :
JOHN BAGACO, PLAINTIFF           :
REPRESENTATIVE FOR JOAO BAGACO,  :
(DECEASED);                      :
                                 :
ILENE BARAJAS, PLAINTIFF         :
REPRESENTATIVE FOR MARTIN        :
BARAJAS, (DECEASED);             :
                                 :
RICKY DOYLE, PLAINTIFF           :
REPRESENTATIVE FOR ANITA         :
BENNETE (DECEASED);              :
                                 :
MARK BLEUER, PLAINTIFF           :
REPRESENTATIVE FOR KAREN         :
BLEUER (DECEASED);               :
                                 :
JULIE RUDOLPH, PLAINTIFF         :
REPRESENTATIVE FOR ANDREW        :
BOISVERT (DECEASED);             :
                                 :
DARLA BOOKER, PLAINTIFF          :
REPRESENTATIVE FOR DOUGLAS       :
LYDELL BOOKER (DECEASED);        :
                                 :
JOSEPH BUCCERI, PLAINTIFF        :
REPRESENTATIVE FOR BARBARA       :
BUCCERI (DECEASED);              :
                                 :
ROBBIE CAHOON, PLAINTIFF         :
REPRESENTATIVE FOR DUSTY         :
CAHOON (DECEASED);               :
                                 :
SHERMECKA DUBOSE, PLAINTIFF      :
REPRESENTATIVE FOR PATRICIA      :
COBB (DECEASED);                 :
                                 :
TERESA GHOSIO, PLAINTIFF         :
REPRESENTATIVE FOR               :
SUSAN CALLARI (DECEASED);        :

TRACIE CATO, PLAINTIFF                    :
REPRESENTATIVE FOR SANDRA CATO            :
(DECEASED);                               :
                                          :
FORESTINE CLARK, PLAINTIFF                :
REPRESENTATIVE FOR EDWARD                 :
CLARK (DECEASED);                         :
                                          :
SONJA CONTRERAS, PLAINTIFF                :
REPRESENTATIVE FOR ENRIQUE                :
CONTRERAS (DECEASED);                     :
                                          :
JAQUELINE CORTEZ-BATEMAN,                 :
PLAINTIFF REPRESENTATIVE FOR              :
WILLIAM CORTEZ (DECEASED);                :
                                          :
NICHOLAS CRISTINO, PLAINTIFF              :
REPRESENTATIVE FOR FRANCIS                :
CRISTINO (DECEASED);                      :
                                          :
AARON CURRIE, PLAINTIFF                   :
REPRESENTATIVE FOR BONITA                 :
CURRIE (DECEASED);                        :
                                          :
SUSAN VERBACK, PLAINTIFF                  :
REPRESENTATIVE FOR  VIRGINA               :
CWIAKALA (DECEASED);                      :
                                          :
DIANE DAHL, PLAINTIFF                     :
REPRESENTATIVE FOR MICHAEL A.             :
DAHL SR. (DECEASED);                      :
                                          :
DIANA DASENT, PLAINTIFF                   :
REPRESENTATIVE FOR MARY DASENT            :
(DECEASED);                               :
                                          :
JOANNE YOBAK, PLAINTIFF                   :
REPRESENTATIVE FOR RITA JANE              :
DONOHUE (DECEASED);                       :
                                          :
THOMAS·ECCLES, PLAINTIFF                  :
REPRESENTATIVE FOR PATRICIA               :
ECCLES (DECEASED);                        :
                                          :
DANA DUGAS, PLAINTIFF                     :

REPRESENTATIVE FOR BONNIE :
EDWARDS (DECEASED); :
                                          :
LILLIAN FEARS, PLAINTIFF :
REPRSENTATIVE FOR WAYNE FEARS :
(DECEASED); :
                                          :
LISA RICHIE, PLAINTIFF :
REPRESENTATIVE FOR DANIEL MOLZ :
(DECEASED); :
                                          :
                                          :
                    *Plaintiffs* :
                                          :
           V. :
                                          :
                                          :
BOEHRINGER INGELHEIM :
PHARMACEUTICALS, INC.; :
BOEHRINGER INGELHEIM :
CORPORATION; :
BOEHRINGER INGELHEIM USA :
CORPORATION; :
GLAXOSMITHKLINE, LLC; :
GLAXOSMITHKLINE HOLDINGS :
(AMERICAS), INC.; :
PFIZER, INC.; :
SANOFI-AVENTIS U.S. LLC;
SANOFI U.S. SERVICES, INC.

                    *Defendants*

The above-captioned Plaintiffs ("Plaintiffs"), by and through their undersigned attorneys,

allege as follows:

## **INTRODUCTION**

1.      Zantac is the branded name for ranitidine, a "blockbuster" drug sold to treat

heartburn. For decades, Zantac and/or its generic equivalent ranitidine, were promoted by

Defendants as a safe and effective treatment for heartburn. Indeed, Defendants had little incentive

to investigate the dangers in a product that was producing over $1 billion in annual sales.

4

2.     Instead, Defendants turned a blind eye to the fact that ranitidine transforms, over time and under particular conditions, into high levels of N-Nitrosodimethylamine ("NDMA"), a well-known cancer-causing compound.    NDMA has no medicinal or beneficial purpose whatsoever: its only function is to cause cancer and its only use is to induce tumors in animals as part of laboratory experiments.    The U.S. Food and Drug Administration's ("FDA") allowable daily limit of NDMA is 96 nanograms.  A single dose of Zantac contains over 3 million nanograms of NDMA.

3.     In 2019, revelations by independent researchers that ranitidine transforms into NDMA, caused widespread recalls of Zantac and its generic equivalents.  On April 1, 2020, the FDA ordered the immediate withdrawal of all ranitidine-containing products sold in the United States, citing unacceptable levels of NDMA accumulation.

4.     Plaintiffs regularly took various forms of brand name Zantac, including over the counter ("OTC") Zantac, and/or generic ranitidine products, including OTC ranitidine products. These products were manufactured and sold by Defendants.  Plaintiffs developed cancer as a result of taking medication that Defendants designed, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold.  Plaintiffs bring this action seeking damages against the Defendants for causing Plaintiffs' cancer.

**PARTIES**

**Plaintiffs**

5.     Plaintiffs, (hereinafter "Plaintiffs"), are individuals who suffered personal injuries and/or death as a result of using Defendants' dangerously defective ranitidine-containing products. Plaintiffs are citizens of various states, including the State of Connecticut as set forth in the list of Plaintiffs, attached hereto as Exhibit A.

**Defendants**

6.      Defendants Boehringer Ingelheim, GSK, Pfizer, and Sanofi (collectively "Defendants") designed, manufactured, marketed, distributed, labeled, packaged, handled, stored, and/or sold ranitidine-containing products, including the ranitidine-containing products ingested by Plaintiffs.   Defendants have conducted business and derived substantial revenue from marketing, handling, distributing, storing, and selling ranitidine-containing products within each of the States and Territories of the United States, including Connecticut.

### BOEHRINGER INGELHEIM

7.      Boehringer Ingelheim Pharmaceuticals, Inc.,[1] is a Delaware corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877.

8.      Boehringer Ingelheim Corporation is a Nevada corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877.

9.      Boehringer Ingelheim USA Corporation is a Delaware corporation with its principal place of business located at 900 Ridgebury Rd., Ridgefield, Connecticut 06877.

### GSK

10.      GlaxoSmithKline, LLC[2] is a Delaware corporation with its principal place of business located at Five Crescent Drive, Philadelphia, Pennsylvania 19112. Defendant GlaxoSmithKline, LLC's sole member is Defendant GlaxoSmithKline Holdings (America) Inc.

11.      GlaxoSmithKline Holdings (Americas) Inc. is a Delaware corporation with its principal place of business located at 1105 N. Market Street, Suite 622, Wilmington, Delaware 19801.

---

[1] Defendants Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Corporation, and Boehringer Ingelheim USA Corporation shall be collectively referred to as "Boehringer Ingelheim" or "BI."
[2] Defendants GlaxoSmithKline, LLC, and GlaxoSmithKline (America), Inc. shall be collectively referred to as "GSK."

6

**PFIZER**

12.     Pfizer, Inc. ("Pfizer") is a Delaware corporation with its principal place of business located at 235 East 42nd Street, New York, New York 10017.

**SANOFI**

13.     Sanofi-Aventis U.S. LLC[3] is a Delaware limited liability company with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807.  Sanofi-Aventis U.S., LLC's sole member is Defendant Sanofi U.S. Services, Inc.

14.     Sanofi U.S. Services, Inc. is a Delaware corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807.

## JURISDICTION & VENUE

15.     This Court has jurisdiction over the subject matter of this action and the parties.

16.     The causes of action alleged in this Complaint arise out of or relate to the Defendants' contacts with Connecticut.  Substantial activities relating to the design, development, marketing, promotion and sales of ranitidine-containing products were performed by Defendants in Connecticut. Defendants made decisions regarding the design, testing, regulatory communications and processes, marketing strategy, labeling and warnings content for ranitidine containing products in the State of Connecticut.

17.     This Court has personal jurisdiction over Defendants pursuant to, and consistent with, Connecticut's long-arm statute, *Conn. Gen. Stat. § 52-59b*, and the requirements of Due Process in so far that Defendants, acting through agents or apparent agents, committed one or more of the following:

---

[3] Sanofi U.S. Services, Inc. and Defendant Sanofi-Aventis U.S., LLC shall be collectively referred to as "Sanofi."

a.     Defendants transacted, and continue to transact, continuous and systematic business in Connecticut and regularly conduct business, receive substantial revenues, and sell products and perform services in Connecticut;

b.     Defendants engaged in pattern of marketing, selling, and promoting Zantac in every state in the country, including Connecticut;

c.     Defendants caused tortious injury in Connecticut by an act or omission in Connecticut;

d.     Defendants have caused tortious injury in Connecticut by an act or omission outside of Connecticut and Defendants regularly do or solicit business in Connecticut, engage in any other persistent course of conduct in Connecticut or derive substantial revenue goods used or consumed or services rendered in Connecticut or expect or should reasonably expect their acts to have consequences in Connecticut and they derive substantial revenue from interstate or international commerce;

e.     Defendants have an interest in, use or possess real property in Connecticut;

f.     Upon information and belief, Defendant Pfizer engaged in research, development and/or safety and regulatory analysis of the Zantac product, during the relevant time period at issue herein, at their facility located in Groton, CT.

g.     Defendants purposely availed themselves of the privileges of conducting business in Connecticut invoking the benefits and protections of Connecticut law.

h.     Requiring Defendants to litigate this claim in Connecticut does not offend traditional notions of fair play and substantial justice and is permitted by the United States Constitution.

18.     Venue in this action properly lies in Connecticut because a Plaintiff is a citizen of Connecticut and certain Defendants are Connecticut entities as alleged in this complaint.

19.     Plaintiff/Decedent Bacher purchased and ingested prescription and over-the-counter ("OTC") Zantac and generic ranitidine in Connecticut from 2000-2019, which corresponds to the times that each Defendant manufactured the product.  Specifically, GSK manufactured prescription Zantac from 1983-2017, Pfizer manufactured OTC Zantac from 1995-2006, BI manufactured OTC Zantac from 2006-2019, and Sanofi, in conjunction with BI, controlled the ANDA for OTC Zantac and manufactured OTC Zantac from 2017-2020.

20.     As described herein, Plaintiff/Decedent Bacher sustained significant injuries as described herein as a result of his ingestion of Zantac in Connecticut.

21.     This lawsuit is not subject to removal based on the existence of a federal question. Plaintiffs assert common law and/or statutory claims under state law.  These claims do not arise under the Constitution, laws, or treaties of the United States. 28 U.S.C. § 1447(c). There is no federal jurisdiction over this matter because all Plaintiffs assert claims against a forum defendant, Boehringer Ingelheim.   One of the Plaintiffs is a citizen of Connecticut as alleged herein. Defendants are therefore precluded from removing this civil action due to the presence of a forum defendant, Boehringer Ingelheim, with respect to each Plaintiff named herein.  28 U.S.C. § 1441(b)(2) ("A civil action . . . may not be removed if any of the parties properly joined and served as defendants is a citizen of the State in which such action is brought.").

## FACTUAL ALLEGATIONS

**I.**    **The Creation of Ranitidine-Containing Products and their Introduction to the Market.**

22.     Zantac (or ranitidine) was developed by GSK[4] in 1976. GSK, and specifically Glaxo Holdings, Ltd., developed ranitidine in response to the success of the then leading H2 blocker Tagamet (chemically known as cimetidine). The drug belongs to a class of medications called histamine H2-receptor antagonists (or H2 blockers), which decrease the amount of acid produced by the stomach and are used to treat gastric ulcers, heartburn, acid indigestion, sour stomach and other gastrointestinal conditions. In 1983, once the FDA granted approval to GlaxoSmithKline to sell ranitidine under the brand name Zantac, pursuant to the New Drug Application ("NDA") No. 18-703, it quickly became GlaxoSmithKline's most successful product. Indeed, ranitidine became the first prescription drug in history to reach $1 billion in sales.

23.     To get to that goal, GlaxoSmithKline entered into a joint promotion agreement with Hoffmann-LaRoche, Inc., which increased Zantac's U.S. sales force from 400 people to approximately 1,200. More salespersons drove more sales and more profits for GlaxoSmithKline.

24.     In 1993, GlaxoSmithKline entered into a joint venture with Pfizer-predecessor company Warner- Lambert Co. to develop an OTC version of Zantac. In 1995, the FDA approved Zantac 75 mg tablets through NDA 20-520. In 1998, the FDA approved Zantac 75 mg effervescent tablets through NDA 20-745.

25.     In 1998, GlaxoSmithKline and Warner-Lambert Co. ended their joint venture. As part of the separation, Warner-Lambert Co. retained control over the OTC NDA for Zantac and the Zantac trademark in the United States and Canada, but was required to obtain approval from GlaxoSmithKline prior to making any product or trademark improvements or changes. GlaxoSmithKline retained rights to sell OTC Zantac outside of the United States and Canada, and

---

[4] GSK, as it is known today, was created through a series of mergers and acquisitions: In 1989, Smith, Kline & French merged with the Beecham Group to form SmithKline Beecham plc. In 1995, Glaxo merged with the Wellcome Foundation to become Glaxo Wellcome plc. In 2000, Glaxo Wellcome plc merged with SmithKline Beecham plc to form GlaxoSmithKline plc and GlaxoSmithKline LLC.

it retained control over the Zantac trademark internationally.

26.    GlaxoSmithKline's retention of the right to require GlaxoSmithKline's approval for any product improvements or changes came with an inherent duty on the part of GlaxoSmithKline to assure that OTC Zantac remained safe and free from any defects and/or unreasonable risks of danger to the consumers who would ingest OTC Zantac.

27.    In 2000, Pfizer acquired Warner-Lambert Co. and, thereafter, Pfizer controlled the OTC Zantac NDAs until December 2006.

28.    In October 2000, GlaxoSmithKline sold to Pfizer the full rights to OTC Zantac in the United States and Canada pursuant to a divestiture and transfer agreement. As part of that agreement, GlaxoSmithKline divested all domestic OTC Zantac assets to Pfizer, including all trademark rights. The agreement removed the restrictions on Pfizer's ability to seek product line extensions or the approval for higher doses of OTC Zantac..GlaxoSmithKline retained the right to the exclusive use of the Zantac name for any prescription ranitidine-containing product in the United States.

29.    In October 2003, Pfizer submitted NDA 21-698 for approval to market OTC Zantac 150 mg. Preparation of an NDA requires substantial research, development and regulatory work concerning, for example, safety, dosing and manufacturing, including clinical tests and animal studies. See, eg. https://www.fda.gov/drugs/types-applications/new-drug-application-nda. Upon information and belief, Pfizer performed this work in Groton, Connecticut. The FDA approved NDA 21-698 on August 31, 2004.

30.    Throughout the time that Pfizer owned the rights to OTC Zantac, GlaxoSmithKline continued to manufacture the product.

31.    In 2006, pursuant to a Stock and Asset Purchase Agreement, Pfizer sold and

11

divested its entire consumer health division (including employees and documents) to Johnson & Johnson ("J&J"). Because of antitrust issues, however, OTC Zantac was transferred to Boehringer Ingelheim.

32.    Pfizer, through a divestiture agreement, transferred all assets pertaining to its OTC Zantac line of products, including the rights to sell and market all formulations of OTC Zantac in the United States and Canada, as well as all intellectual property, R&D, and customer and supply contracts to Boehringer Ingelheim. As part of that deal, Boehringer Ingelheim obtained control and responsibility over all of the OTC Zantac NDAs.

33.    GlaxoSmithKline continued marketing prescription Zantac in the United States until 2017, and it still holds the NDAs for several prescription formulations of Zantac. GlaxoSmithKline continued to maintain manufacturing and supply agreements relating to various formulations of both prescription and OTC Zantac.

34.    Boehringer Ingelheim owned and controlled the NDAs for OTC Zantac between December 2006 and January 2017, and Boehringer Ingelheim manufactured, marketed, and distributed the drug in the United States during that period.

35.    In 2017, Boehringer Ingelheim sold the rights of OTC Zantac to Sanofi pursuant to an asset swap agreement. As part of that deal, Sanofi obtained control and responsibility over Boehringer Ingelheim's entire consumer healthcare business, including the OTC Zantac NDAs. As part of this agreement, Boehringer Ingelheim and Sanofi entered into a manufacturing agreement wherein Boehringer continued to manufacture OTC Zantac for Sanofi. Sanofi has controlled the OTC Zantac NDAs and marketed, sold, and distributed Zantac in the United States from January 2017 until 2019 when it issued a recall and ceased marketing, selling, and distributing OTC Zantac.

12

36.    Sanofi voluntarily recalled all brand-name OTC Zantac on October 18, 2019.

37.    Zantac became available without a prescription in 1996, and generic versions of Zantac (ranitidine) became available in approximately 1997. Although sales of brand-name Zantac declined as a result of generic and alternative products, Zantac sales have remained strong over time. As recently as 2018, Zantac was one of the top 10 antacid tablet brands in the United States, with sales of Zantac 150 totaling $128.9 million – a 3.1% increase from the previous year.

38.    The times during which each Defendant manufactured and sold branded Zantac pills are alleged below:

| Defendant | Prescription or OTC | Sale Start Date Year | Sale End Date Year |
|---|---|---|---|
| GSK | Prescription | 1983 | 2017 |
| Pfizer | OTC | 1995 | 2006 |
| Boehringer Ingelheim | OTC | 2006 | 2019 |
| Sanofi | OTC | 2017 | 2020 |

## II.    The Dangers of NDMA.

39.    NDMA is a semi-volatile organic chemical that forms in both industrial and natural processes. It is a member of N-nitrosamines, a family of potent carcinogens. The dangers that NDMA poses to human health have long been recognized. A news article published in 1979 noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[5] NDMA is no

---

[5] Jane Brody, *Bottoms Up: Alcohol in moderation can extend life,* THE GLOBE AND MAIL (CANADA) (Oct. 11, 1979); *see* Rudy Platiel, *Anger grows as officials unable to trace poison in reserve's water,* THE GLOBE AND MAIL CANADA) (Jan. 6, 1990) (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because testing has found high levels of N-nitrosodimethylamine (NDMA), an industrial byproduct chemical that has been linked to cancer"); Kyrtopoulos et al, *DNA adducts in humans after exposure to methylating agents,* 405 MUTAT. RESEAR. 135 (1998) (noting that "chronic exposure of rats to very low doses of NDMA gives rise predominantly to liver tumors, including tumors of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").

13

longer produced or commercially used in the United States, except for research, such as a tumor initiator in certain animal bioassays. In other words, it is only a poison.

40.    Both the Environmental Protection Agency ("EPA") and the International Agency for Research on Cancer ("IARC") have classified NDMA as a probable human carcinogen.

41.    The World Health Organization ("WHO") states that there is "conclusive evidence that NDMA is a potent carcinogen" and that there is "clear evidence of carcinogenicity."[6]  The WHO has stated that scientific testing indicates that NDMA consumption is positively associated with either gastric or colorectal cancer and suggests that humans may be especially sensitive to the carcinogenicity of NDMA.

42.    The Department of Health and Human Services ("DHHS") states that NDMA is reasonably anticipated to be a human carcinogen.[7]  This classification is based upon DHHS's findings that NDMA caused tumors in numerous species of experimental animals, at several different tissue sites, and by several routes of exposure, with tumors occurring primarily in the liver, respiratory tract, kidney, and blood vessels.[8]

43.    As early as 1980, consumer products containing unsafe levels of NDMA and other nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the FDA.

44.    Most recently, beginning in the summer of 2018, several generic drugs used to treat high blood pressure and heart failure – valsartan, losartan, and irbesartan – were recalled because the medications contained nitrosamine impurities that do not meet the FDA's safety standards.

45.    The FDA has established a permissible daily intake limit for the probable human carcinogen, NDMA, of 96 ng (nanograms). One filtered cigarette contains between 5 - 43 ng of

---

[6] World Health Org., *Guidelines for Drinking Water Quality, N-Nitrosodimethylamine (NDMA)* (3d ed. 2008),https://www.who.int/water_sanitation_health/dwq/chemicals/ndmasummary_2ndadd.pdf.
[7] *Id.* at 3.
[8] *Id.*

NDMA. Recent testing shows that a single pill of ranitidine may contain staggering NDMA levels in excess of 3,000,000 ng.

46.    Numerous *in vitro* studies confirm that NDMA is a mutagen – causing mutations in human and animal cells.

47.    In mouse studies examining the carcinogenicity of NDMA through oral administration, animals exposed to NDMA developed cancer in the kidney, bladder, liver, and lung.  In comparable rat studies, similar cancers were observed in the liver, kidney, pancreas, and lung.  In comparable hamster studies, similar cancers were observed in the liver, pancreas, and stomach. In comparable guinea pig studies, similar cancers were observed in the liver and lung. In comparable rabbit studies, similar cancers were observed in the liver and lung.

48.    In other long-term animal studies of mice and rats utilizing different routes of exposures – inhalation, subcutaneous injection, and intraperitoneal (abdomen injection) – cancer was observed in the lung, liver, kidney, nasal cavity, and stomach.

49.    Overall, the animal studies demonstrate that NDMA is carcinogenic in all animal species tested: mice; rats; Syrian golden, Chinese, and European hamsters; guinea pigs; rabbits; ducks; mastomys; fish; newts; and frogs.

50.    Pursuant to the EPA's cancer guidelines, "tumors observed in animals are generally assumed to indicate that an agent may produce tumors in humans."

51.    In addition to the overwhelming animal data linking NDMA to cancer, there are numerous human epidemiological studies exploring the effects of dietary exposure to various cancers.  While these studies (several discussed below) consistently show increased risks of various cancers, the exposure levels considered in these studies are a very small fraction – as little as 1 millionth – of the exposures noted in a single Zantac capsule, i.e., 0.191 ng/day (dietary).

15

304,500 ng/day (Zantac).

52.    In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 220 cases, researchers observed a statistically significant 700% increased risk of gastric cancer in persons exposed to more than 0.51 ng/day of NDMA.[9]

53.    In a 1995 epidemiological case-control study of NDMA dietary exposure in 746 cases, researchers observed statistically significant elevated rates of gastric cancer in persons exposed to more than 0.191 ng/day.[10]

54.    In another 1995 epidemiological case-control study of, in part, the effects of dietary consumption on cancer, researchers observed a statistically significant elevated risk of developing aerodigestive cancer after being exposed to NDMA at 0.179 ng/day.[11]

55.    In a 1999 epidemiological cohort study of NDMA dietary exposure in 189 cases and a follow up of 24 years, researchers noted that "N-nitroso compounds are potent carcinogens" and that dietary exposure to NDMA more than doubled the risk of developing colorectal cancer.[12]

56.    In a 2000 epidemiological cohort study of occupational exposure of workers in the rubber industry, researchers observed significant increased risks for NDMA exposure for esophagus, oral cavity, pharynx, prostate, and brain cancer.[13]

57.    In a 2011 epidemiological cohort study of NDMA dietary exposure in 3,268 cases and a follow up of 11.4 years, researchers concluded that "[d]ietary NDMA intake was significantly associated with increased cancer risk in men and women" for all cancers, and that

---

[9] Pobel et al, *Nitrosamine, nitrate and nitrite in relation to gastric cancer: a case-control study in Marseille, France,* 11 EUROP. J. EPIDEMIOL. 67-73 (1995).
[10] La Vecchia et al, *Nitrosamine intake and gastric cancer risk,* 4 EUROP. J. CANCER. PREV. 469-474 (1995).
[11] Rogers et al, *Consumption of nitrate, nitrite, and nitrosodimethylamine and the risk of upper aerodigestive tract cancer,* 5 CANCEREPIDEMIOL. BIOMARKERS PREV. 29-36 (1995).
[12] Knekt et al, *Risk of Colorectal and Other Gastro-Intestinal Cancers after Exposure to Nitrate, Nitrite and N-nitroso Compounds: A Follow-Up Study,* 80 INT. J. CANCER 852-856 (1999).
[13] Straif et al, Exposure to high concentrations of nitrosamines and cancer mortality among a cohort of rubber workers, 57 OCCUP ENVIRON MED 180-187 (2000).

"NDMA was associated with increased risk of gastrointestinal cancers" including rectal cancers.[14]

58.    In a 2014 epidemiological case-control study of NDMA dietary exposure in 2,481 cases, researchers found a statistically significant elevated association between NDMA exposure and colorectal cancer.[15]

59.    In addition, NDMA breaks down into various derivative molecules that, themselves, are associated with causing cancer. In animal studies, derivatives of NDMA induced cancer in the stomach and intestine, including colon.

60.    In animal experiments, for those animals exposed to NDMA during pregnancy, the offspring had elevated rates of cancer in the liver and kidneys.

## III.    How Ranitidine Transforms into NDMA Within the Body and Through Exposure to Heat, Moisture and/or Time.

61.    At the time that ranitidine was developed, there was scientific literature suggesting that drugs like ranitidine, which contain a dimethylamine ("DMA") group within the molecule, are highly likely to form NDMA, when combined with other nitrates in the body. Indeed, nitrate is not only naturally found in the body, but bacteria and enzymes in the body reduce the nitrates ($NO3$) found in food into nitrites ($NO2-$). In addition, many foods and preservatives contain nitrates.

62.    Because of the presence of nitrates in the body, Glaxo scientists should have known that human physiology and diet would lead to the development of NDMA in the human body after the ingestion of ranitidine.

63.    The high levels of NDMA produced by Zantac are inherent to the molecular structure of ranitidine, the active ingredient in Zantac. The ranitidine molecule contains both a

---

[14] Loh et al, N-nitroso compounds and cancer incidence: the European Prospective Investigation into Cancer and Nutrition (EPIC)-Norfolk Study, 93 AM J CLIN NUTR. 1053-61 (2011).
[15] Zhu et al, *Dietary N-nitroso compounds and risk of colorectal cancer: a case-control study in Newfoundland and Labrador and Ontario, Canada,* 111 BR JNUTR. 6, 1109-1117 (2014).

nitrite ("NO3") and a dimethylamine ("DMA") group which are well known to combine to form NDMA. Thus, ranitidine produces NDMA by "react[ing] with itself," which means that *every dosage and form of ranitidine,* including Zantac, exposes users to NDMA.

64.     The formation of NDMA by the reaction of DMA and a nitroso source (such as a nitrite) is well characterized in the scientific literature and has been identified as a concern for contamination of the American water supply.[16] Indeed, in 2003, alarming levels of NDMA in drinking water processed by wastewater treatment plants were specifically linked to the presence of ranitidine.[17]

65.     In 1981, the year Zantac was launched commercially outside of the United States, two exchanges in *The Lancet*—one of the most widely read and respected medical and scientific publications—discussed the potential toxicity of cimetidine and ranitidine. Cimetidine, also an H2 blocker, has a similar chemical structure to ranitidine.

66.     Dr. Silvio de Flora, an Italian researcher from the University of Genoa, wrote about experiments he conducted regarding cimetidine and ranitidine in human gastric fluid. When ranitidine was exposed to gastric fluid in combination with nitrites, his experiment showed "toxic and mutagenic effects [.]"[18] Dr. de Flora hypothesized that these effects could have been caused by the "formation of more than one nitroso derivative [which includes NDMA] under our experimental conditions." Concerned with these results, Dr. de Flora cautioned that, in the context of ranitidine ingestion, "it would seem prudent to avoid nitrosation as far as possible by, for example, suggesting a diet low in nitrates and nitrites, by asking patients not to take these at times

---

[16] Ogawa et al, *Purification and properties of a new enzyme, NG, NG-dimethylarginine dimethylaminohydrolase, from rat kidney.* 264 J. BIO. CHEM. 17, 10205-10209 (1989).

[17] Mitch et al, *N-Nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: A Review,* 20 ENV. ENG, SCI. 5, 389-404 (2003).

[18] De Flora, *Cimetidine, Ranitidine, and Their Mutagenic Nitroso Derivatives,* THE LANCET 993-994 (Oct. 31, 1981).

close to (or with) meals, or by giving inhibitors of nitrosation such as ascorbic acid."

67.    GSK responded to Dr. de Flora's concern.[19] A group of GSK researchers specifically noted they were "obviously concerned as to whether or not a mutagenic N-nitroso derivative of ranitidine could be formed in the stomach." GSK acknowledged that in the presence of nitrites, a "N-nitroso nitrolic acid derivative was formed" that was "mutagenic [.]" GSK, however, dismissed this finding because the levels of nitrate used were much higher than what would be expected to occur after a meal, and, therefore, any N-nitroso compound found would not likely occur in a person in real world experiences. GSK asserted that "no mutagenic nitrosated product of ranitidine is likely to be formed in man under any conceivable physiological conditions [.]"

68.    In 1983, the same year Zantac was approved in the United States, seven researchers from the University of Genoa published a study discussing the nitrosation of ranitidine and its genotoxic effects (ability to harm DNA).[20]  The researchers concluded:

> [I]t appears that reaction of ranitidine with excess sodium nitrite under acid conditions gives rise to a nitroso-derivative (or derivatives) [like NDMA] capable of including damage in mammalian cells. [...] These findings are consistent with those of Dr. de Flora, who showed that preincubation of ranitidine with excess nitrite in human gastric juice resulted in mutagenic effects.

69.    Also in 1983, Dr. de Flora, along with four other researchers, published the complete findings.[21] The results "confirm our preliminary findings on the formation of genotoxic derivatives from nitrite and ranitidine [.]" *Id.* Again, the authors noted that, "the widespread clinical use [of ranitidine] and the possibility of a long-term maintenance therapy suggest the

---

[19] Brittain et al, *The Safety of Ranitidine*, THE LANCET 1119 (Nov. 14, 1981).
[20] Maura et al, *DNA Damage Induced by Nitrosated Ranitidine in Cultured Mammalian Cells*, 18 TOX. LTTRS. 97-102 (1983).
[21] De Flora et al, *Genotoxicity of nitrosated ranitidine*, 4 CARCINOGENESIS 3, 255-260 (1983).

prudent adoption of some simple measures, such as a diet low in nitrates and nitrites or the prescription of these anti-ulcer drugs at a suitable interval from meals [...] Absorbic acid has been proposed as an inhibitor of nitrosation combined with nitrosatable drugs and appears to block efficiently the formation of mutagenic derivatives from [...] ranitidine." *Id.*

70.    The high instability of the ranitidine molecule was elucidated in scientific studies investigating ranitidine as a source of NDMA in drinking water and specific mechanisms for the breakdown of ranitidine were proposed.[22] These studies underscore the instability of the NDMA group on the ranitidine molecule and its ability to form NDMA in water treatment plants which supply many American cities with water.

71.    These studies did not appreciate the full extent of NDMA formation risk from ranitidine; specifically, the added danger of this drug having not only a labile, or easily broken down, DMA group but also a readily available nitroso source in its nitrite group on the opposite terminus of the molecule. Recent testing of NDMA levels in ranitidine batches are so high that the nitroso for NDMA likely comes from no other source than the ranitidine molecule itself.

72.    Valisure, LLC ("Valisure") is an online pharmacy that also runs an analytical laboratory that is accredited by the International Organization for Standardization ("ISO")—an accreditation recognizing the laboratories technical competence for regulatory compliance. Valisure's mission is to help ensure the safety, quality, and consistency of medications and supplements in the market. In response to rising concerns about counterfeit medications, generics, and overseas manufacturing, Valisure developed proprietary analytical technologies that it uses in addition to FDA standard assays to test every batch of every medication it dispenses.

73.    As part of its testing of Zantac, and other ranitidine products, in every lot tested,

---

[22] Le Roux et al, *NDMA Formation by Chloramination of Ranitidine: Kinetics and Mechanism,* 46 *Environ. Sci. Technol.* 20, 11095-11103 (2012)

Valisure discovered exceedingly high levels of NDMA. Valisure's ISO 17025 accredited laboratory used FDA recommended GC/MS headspace analysis method FY 19-005-DPA8 for the determination of NDMA levels. As per the FDA protocol, this method was validated to a lower limit of detection of 25 ng.[23]

74.    Valisure's testing shows, on average, 2,692,291 ng of NDMA in a 150 mg Zantac tablet. Considering the FDA's permissible limit is 96 ng, this would put the level of NDMA at *28,000 times* the legal limit.   In terms of smoking, a person would need to smoke at least 6,200 cigarettes to achieve the same levels of NDMA found in one 150 mg dose of Zantac.

75.    Valisure was concerned that the extremely high levels of NDMA observed in its testing were a product of the modest oven heating parameter of 130 °C in the FDA recommended GC/MS protocol. Thus, Valisure developed a low temperature GC/MS method to see if it could still detect NDMA at 37 °C, the average temperature of the human body.

76.    Valisure tested ranitidine tablets by themselves and in conditions simulating the human stomach. Industry standard "Simulated Gastric Fluid" ("SGF" 50 mM potassium chloride, 85 mM hydrochloric acid adjusted to pH 1.2 with 1.25 g pepsin per liter) and "Simulated Intestinal Fluid" ("SIF" 50 mM potassium chloride, 50 mM potassium phosphate monobasic adjusted to pH 6.8 with hydrochloric acid and sodium hydroxide) were used alone and in combination with various concentrations of nitrite, which is commonly ingested in foods like processed meats and is elevated in the stomach by antacid drugs.  Indeed, Zantac was specifically advertised to be used when consuming foods containing high levels of nitrates, like tacos, pizza, etc.[24]

77.    The results of Valisure's tests on ranitidine tablets in biologically relevant

---

[23] US Food and Drug Administration. (updated 01/25/2019). Combined N-Nitrosodimethlyamine (NDMA) and N-Nitrosodiethylamine (NDEA) Impurity Assay, *FY*19-005-DPA-S.
[24] *See, e.g.*, https://www.ispot.tv/ad/dY7n/zantac-family-taco-night; https://youtu.be/jzS2kuB5_wg; https://youtu.be/Z3QMwkSUIEg ; https://youtu.be/qvh9gyWgQns.

conditions demonstrate significant NDMA formation under simulated gastric conditions with nitrite present.

| Table 2 – Valisure Biologically relevant tests for NDMA formation | | |
|---|---|---|
| **Ranitidine Tablet Studies** | **NDMA (ng/mL)** | **NDMA per tablet (ng)** |
| Tablet without Solvent | Not Detected | Not Detected |
| Table 2 – Valisure Biologically relevant tests for NDMA formation | | |
| **Ranitidine Tablet Studies** | **NDMA (ng/mL)** | **NDMA per tablet (ng)** |
| Tablet | Not Detected | Not Detected |
| Simulated Gastric Fluid ("SGF") | Not Detected | Not Detected |
| Simulated Intestinal Fluid | Not Detected | Not Detected |
| SGF with 10 mM Sodium Nitrite | Not Detected | Not Detected |
| SGF with 25 mM Sodium Nitrite | 236 | 23,600 |
| SGF with 50 mM Sodium Nitrite | 3,045 | 304,500 |

78.    Under biologically relevant conditions, when sufficient nitrites are present, staggeringly high levels of NDMA are found in one dose of 150 mg Zantac, ranging between 245 and 3,100 times above the FDA allowable limit.  In terms of smoking, one would need to smoke over 500 cigarettes to achieve the same levels of NDMA found in one dose of 150 mg Zantac at the 25 ng level (over 7,000 for the 50 μg level).

79.    Antacid drugs are known to increase stomach pH and thereby increase the growth of nitrite-reducing bacteria which further elevate levels of nitrite. This fact is well known and even present in the warning labels of antacids like Prevacid (lansoprazole) and was specifically studied with ranitidine in the original approval of the drug. Thus, higher levels of nitrites in patients

22

regularly taking Zantac would be expected.

80.    In fact, NDMA formation in the stomach has been a concern for many years, and ranitidine has been specifically implicated as a cause of NDMA formation by multiple research groups, including those at Stanford University.

81.    Existing research shows that ranitidine interacts with nitrites and acids in the chemical environment of the human stomach to form NDMA. *In vitro* tests demonstrate that when ranitidine undergoes "nitrosation" (the process of a compound being converted into nitroso derivatives) by interacting with gastric fluids in the human stomach, the byproduct created is dimethylamine ("DMA")—which is an amine present in ranitidine itself. When DMA is released, it can be nitrosated even further to form NDMA, a secondary N-nitrosamine.

82.    Moreover, in addition to the gastric fluid mechanisms investigated in the scientific literature, Valisure identified a possible enzymatic mechanism for the liberation of ranitidine's DMA group via the human enzyme dimethylarginine dimethylaminohydrolase ("DDAH") which can occur in other tissues and organs separate from the stomach.

83.    Liberated DMA can lead to the formation of NDMA when exposed to nitrite present on the ranitidine molecule, nitrite freely circulating in the body, or other potential sources— particularly in weak acidic conditions such as those in the kidney or bladder. The original scientific paper detailing the discovery of the DDAH enzyme in 1989 specifically comments on the propensity of DMA to form NDMA: "This report also provides a useful knowledge for an understanding of the endogenous source of dimethylamine as a precursor of a potent carcinogen, dimethylnitrosamine [NDMA]."[25]

84.    Computational modelling demonstrates that ranitidine can readily bind to the

---

[25] Ogawa et ai *Purification and properties of a new enzyme, NG, NG-dimethylarginine dimethylaminohydrolase, from rat kidney,* 264J. BIO. CHEM 17, 10205-10209 (1989).

DDAH-1 enzyme in a manner similar to the natural substrate of DDAH-1 known as asymmetric dimethylarginine ("ADMA").

85.    These results indicate that the enzyme DDAH-1 increases formation of NDMA in the human body when ranitidine is present; therefore, the expression of the DDAH-1 gene is useful for identifying organs most susceptible to this action.

86.    DDAH-1 is most strongly expressed in the kidneys but also broadly distributed throughout the body, such as in the liver, stomach, bladder, brain, colon, and prostate. This offers both a general mechanism for NDMA formation in the human body from ranitidine and specifically raises concern for the effects of NDMA on numerous organs, including the bladder.

87.    In addition to the aforementioned *in vitro* studies that suggest a strong connection between ranitidine and NDMA formation, *in vivo* clinical studies in living animals add further weight to concern over this action and overall potential carcinogenicity. A study published in the journal *Carcinogenesis* in 1983 titled "Genotoxic effects in rodents given high oral doses of ranitidine and sodium nitrite" specifically suspected the carcinogenic nature of ranitidine in combination with nitrite. The authors of this study concluded: "Our experimental findings have shown that simultaneous oral administration in rats of high doses of ranitidine and NaNO2 [nitrite] can produce DNA fragmentation either in liver or in gastric mucosa."[26]

88.    The human data is also concerning. In 2002, a study indicated that NDMA was found in the urine and gastric fluid of children after taking ranitidine for four weeks.[27] Yet, Defendants didn't undertake an investigation or take any steps to prevent harm to the millions of children that were unknowingly ingesting a carcinogen all over the world. Instead, Defendants

---

[26] Brambilla et al., *Genotoxic effects in rodents given high oral doses of ranitidine and sodium nitrite.* 4 CARCINOGENESIS 10, 1281-1285 (1983).
[27] Krawczynski, et al. *Nitrozamines in Children with Chronic Gastritis*; Journal of Polish Paediatric Society (2002); 0031-3939.

continued to maliciously, recklessly, and aggressively market and sell Zantac as safe for use during pregnancy and for pediatric use.

89.    A study completed and published in 2016 by Stanford University observed that healthy individuals, both male and female, who ingested Zantac 150 mg tablets produced roughly 400 times elevated amounts of NDMA in their urine (over 47,000 ng) in the proceeding 24 hours after ingestion.[28]

90.    A 2004 study published by the National Cancer Institute investigated 414 cases of peptic ulcer disease reported in 1986 and followed the individual cases for 14 years.[29] One of the variables investigated by the authors was the patients' consumption of a prescription antacid, either Tagamet (cimetidine) or Zantac (ranitidine). The authors concluded that "[r]ecent use of ulcer treatment medication (Tagamet and Zantac) was also related to the risk of bladder cancer, and this association was independent of the elevated risk observed with gastric ulcers." Specifically, the authors note that "N-Nitrosamines are known carcinogens, and nitrate ingestion has been related to bladder cancer risk." NDMA is among the most common of the N-Nitrosamines.

91.    A 1982 clinical study in rats compared ranitidine and cimetidine exposure in combination with nitrite. When investigating DNA fragmentation in the rats' livers, no effect was observed for cimetidine administered with nitrite, but ranitidine administered with nitrite resulted in a significant DNA fragmentation.[30]

92.    A new study published in 2001 by doctors from the Memorial Sloan Kettering

---

[28] Zeng et al, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine,* 37 CARCINOGENESIS 625-634 (2016).
[29] Michaud et al, *Peptic ulcer disease and the risk of bladder cancer in a prospective study of male health professionals,* 13 CANCER EPIDEMIOL BIOMARKERS PREV. 2, 250-254 (2004).
[30] Brambilla et al, Genotoxic Effects of Drugs: Experimental Findings Concerning Some Chemical Families of Therapeutic Relevance, Nicolini C. (eds) Chemical Carcinogenesis. NATO Advanced Study Institutes Series (Series A: Life Sciences), Vol 52. Springer, Boston, MA (1982).

Cancer Center confirmed the link between Zantac and NDMA. [31]

93.     The risk of creating NDMA by exposing ranitidine to heat has been well-known and documented. Early studies, including the one conducted by GSK in the early 1980s, demonstrated that nitrosamines were formed when ranitidine was exposed to heat. This point was underscored in the Valisure petition, which initially used a high-heat testing method.

94.     On January 2, 2020, Emery Pharma, an FDA-certified pharmaceutical testing laboratory, conducted a series of tests on ranitidine. The researchers exposed ranitidine to 70 degrees Celsius for varying periods of time. The results showed that increasing levels of NDMA formed based on exposure to heat. Emery Pharma reported on how NDMA accumulates over time when exposed to 70 degrees Celsius.

95.     The researchers cautioned:

> NDMA accumulates in ranitidine-containing drug products on exposure to elevated temperatures, which would be routinely reached during shipment and during storage. More importantly, these conditions occur post-lot release by the manufacturer. Hence, while NDMA levels in ranitidine may be acceptable at the source, they may not be so when the drug is purchased and subsequently at the time of consumption by the consumer.

96.     The results of this data demonstrate that in normal transport and storage, and especially when exposed to heat or humidity, the ranitidine molecule systematically breaks down into NDMA, accumulating over time in the finished product. Considering ranitidine-containing products have an approved shelf life of 36 months, the possibility of the drug accumulating dangerously high levels of NDMA prior to consumption is underscored by the FDA's swift removal of the product from the market.

[31] Braunstein LZ, Kantor ED, O'Connell K, et al. Analysis of Ranitidine-Associated N-Nitrosodimethylamine Production Under Simulated Physiologic Conditions. *JAMA Netw Open.* 2021;4(1):e2034766. doi:10.1001/jamanetworkopen.2020.34766

97.     In fact, the FDA acknowledged that testing revealed that NDMA levels in ranitidine products stored at room temperature can increase with time to unacceptable levels.

## IV.     Defendants Knew of the NDMA Defect but Failed to Take Permitted (or Required) Actions to Address Known Risks.

98.     During the time that Defendants manufactured, distributed, transported, stored, and sold ranitidine-containing products in the United States, the weight of scientific evidence showed that ranitidine-containing products exposed users to unsafe levels of NDMA. Defendants failed to disclose this risk to consumers on the drug's label - or through any other means - and Defendants failed to report these risks to the public.

99.     Going back as far as 1981, two years before Zantac entered the market, research showed elevated rates of NDMA when properly tested. This was known or should have been known by Defendants.

100.     Defendants were required to act to address the known risks of the ranitidine-containing products they manufactured and sold. By registering with the FDA to manufacture, label, distribute, and sell ranitidine-containing products within the US, all Defendants holding an ANDA,[32] NDC Code[33] or which registered an establishment[34] had an obligation to comply with federal law.[35]

---

[32] Once a manufacturer's ANDA is approved, that manufacturer is subject to post-market obligations. These obligations include submitting annual reports to the FDA, tracking and reporting adverse events, and tracking and reporting relevant medical literature among other things.

[33] All Defendants who have the power of labeling and listing drugs within the United States must obtain a National Drug Code ("NDC"). All NDC holders are required to register all drugs and list them with the FDA.

[34] All Defendants who have registered establishments with the FDA must provide "[c]omplete, accurate and up-to-date establishment registration and drug listing information [which] is essential to promote patient safety. FDA relies on establishment registration and drug listing information for several key programs, including: drug establishment inspections, post market surveillance, counterterrorism, recalls, drug quality reports, adverse event reports, monitoring of drug shortages and availability, supply chain security, drug import and export, and identification of products that are marketed without an approved application"

[35] Plaintiffs reference federal law herein not in any attempt to enforce it, but only to demonstrate that their state-law tort claims do not impose any additional obligations on Defendants beyond what is already required for them under federal law.

**A.    Defendants Failed to Adequately Warn Physicians, Patients, and the Public About the NDMA Risk.**

101.    Defendants concealed the Zantac–NDMA link from consumers in part by not reporting it to the FDA, which relies on drug manufacturers to bring new information about an approved drug like Zantac to the agency's attention.    Defendants disregarded the scientific evidence available to them and did not report to the FDA significant information alleged above affecting the safety or labeling of Zantac.    Defendants did not propose a disclosure that would warn healthcare providers and patients of the link between ranitidine and NDMA.

102.    Defendants also never disclosed the relevant studies to the public, nor did they publicly disclose the link between ranitidine and NDMA.

103.    In a 1981 study published by GSK, the innovator of the ranitidine molecule, the metabolites of ranitidine in urine were studied using liquid chromatography.[36] Many metabolites were listed, though there is no indication that the study looked for NDMA.    Upon information and belief, this was intentional – a gambit by the manufacturer to avoid detecting a carcinogen in their product.

104.    Indeed, Dr. de Flora published a note in *The Lancet* discussing the results of his experiments showing that ranitidine was turning into mutagenic N-nitroso compounds, of which NDMA is one, in human gastric fluid when accompanied by nitrites. Defendants were aware of this as GSK specifically responded to the note and attempted to discredit it. Notwithstanding this legal risk signal, GSK did not test for this alarming cancer risk, and it did so intentionally.

105.    By 1987, after numerous studies raised concerns over ranitidine and cancerous nitroso compounds (discussed previously), GSK published a clinical study specifically focus

---

[36] Carey et al, *Determination of ranitidine and its metabolites in human urine by reversed-phase ion-pair high-performance liquid chromatography,* 255 J. CHROMATOGRAPHY B: BIOMEDICAL SCI. & APPL. 1, 161-168 (1981).

28

investigating gastric contents in human patients and N-nitroso compounds.[37] This study specifically indicated that there were no elevated levels of N-nitroso compounds (of which NDMA is one). However, the study was rigged to fail. It used an analytical system called a "nitrogen oxide assay" for the determination of N-nitrosamines, which was developed for analyzing food and is a detection method that indirectly and non-specifically measures N-nitrosamines. Furthermore, in addition to this approach being less accurate, GSK also removed all gastric samples that contained ranitidine out of concern that samples with ranitidine would contain "high concentrations of N-nitroso compounds being recorded." So, without the chemical being present in any sample, any degradation into NDMA could not, by design, be observed. This spurious test was intentionally designed to mask any potential cancer risk.

106.    In fact, on information and belief, none of the Defendants ever used a mass spectrometry assay to test for the presence of nitrosamines in any of the studies and trials they did in connection with its trials associated with the ranitidine NDA. This is because when using mass spectrometry, it requires heating of up to 130 °C which can result in excessive amounts of nitrosamines being formed. Had the Defendants used a mass spectrometry assay, the results would have revealed large amounts of NDMA, and the FDA would never have approved Zantac as being safe.

107.    There are multiple alternatives to Zantac that do not pose the same risk, such as Cimetidine (Tagamet), Famotidine (Pepcid), Omeprazole (Prilosec), Esomeprazole (Nexium), and Lansoprazole (Prevacid).

**B.    Defendants Failed to Notify the FDA About the Presence of NDMA in Ranitidine-Containing Products.**

---

[37] Thomas et al, *Effects of one year's treatment with ranitidine and of truncal vagotomy on gastric contents,* 6 *GUT.* Vol. 28, 726-738 (1987).

108.    Manufacturers of an approved drug are required by regulation to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety pursuant to 21 C.F.R. § 314.81(b)(2):

> The report is required to contain . . . [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.

109.    21 C.F.R. § 314.81(b)(2)(v) provides that the manufacturer's annual report must also contain:

> Copies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (e.g., mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product.

110.    Defendants ignored these regulations and, disregarding the scientific evidence available to them regarding the presence of NDMA in their products and the risks associated with NDMA, did not report to the FDA significant information affecting the safety or labeling of ranitidine-containing products.

111.    Knowledge regarding the risk of NDMA in ranitidine was sufficiently available in the publicly available scientific literature such that any Defendant, consistent with its heightened obligations to ensure the safety of its products, knew or should have known about the potential NDMA risks associated with ranitidine consumption.

112.    Defendants never conducted or provided the relevant studies to the FDA, nor did they present the FDA with a proposed disclosure noting the various ways that ranitidine transforms into NDMA. Accordingly, because Defendants never properly disclosed the risks to the FDA, they never proposed any labeling or storage / transportation guidelines that would have addressed this

risk. Thus, the FDA was never able to reject any proposed warning or proposal for transport / storage.

113.    When the FDA eventually learned about the NDMA risks posed by ranitidine-containing products, it ordered manufacturers to voluntarily remove the products from the market. Thus, had any Defendant alerted the FDA to the risks of NDMA, the FDA would have required the manufacturers to remove ranitidine-containing products from the market earlier.

### C.    Defendants Failed to Adhere to Proper Manufacturing and Storage Practices.

114.    Defendants stored Ranitidine-Containing Products in preparation for their sale. Under federal law, a manufacturer must manufacture, store, warehouse, and distribute pharmaceutical drugs in accordance with "Current Good Manufacturing Practices" ("CGMPs") to ensure they meet safety, quality, purity, identity, and strength standards.  21 C.F.R. § 210.1(a) states that the CGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess." Entities at all phases of the design, manufacture, and distribution chain are bound by these requirements.

115.    Pursuant to 21 C.F.R. § 211.142(b), the warehousing of drug products shall provide for "[s]torage of drug products under appropriate conditions of temperature, humidity, and light so that the identity, strength, quality, and purity of the drug products are not affected." In other words, Defendants had a duty and were obligated to properly store, handle, and warehouse ranitidine.

116.    Testing conducted by the FDA confirms that under accelerated conditions, elevated

temperatures can lead to the presence of NDMA in the drug product.

117.    FDA has also concluded that NDMA can increase in ranitidine under storage conditions allowed by the labels, and NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during normal distribution and handling. FDA's testing also showed that the level of NDMA in ranitidine-containing products increases with time. And while Emery's Citizen Petition sought to obtain a directive regarding temperature- controlled shipping of ranitidine, which was necessary given the time and temperature sensitivity of the drug, that request was deemed moot by the FDA because the agency sought to withdraw ranitidine-containing products altogether.

118.    Nothing prevented any Defendant from, on their own, taking actions to prevent accumulation of NDMA in ranitidine-containing products by ensuring that ranitidine was not exposed to heat or moisture over long periods.

119.    Defendants could dictate and control the conditions under which Zantac, in both its API and finished dose forms, were transported, packaged and stored.  Yet, Defendants failed to ensure that their ranitidine-containing products were kept safely from excessive heat and humidity.

## V.    Zantac and Ranitidine-Containing Products Are Pulled From the Market.

120.    On September 13, 2019, in response to a citizen's petition filed by Valisure, LLC (discussed in detail below), U.S. and European regulators stated that they are reviewing the safety of ranitidine.

121.    On October 2, 2019, the FDA stated that it was ordering all manufacturers of Zantac and ranitidine products to conduct testing for NDMA and that preliminary results indicated unacceptable levels of NDMA so far.

122.    On November 1, 2019, the FDA released its preliminary results, showing unsafe

levels of NDMA in various ranitidine products, including Zantac.

123.    At no time did any Defendant attempt to include a warning about NDMA or any cancer, nor did the FDA ever reject such a warning. Defendants had the ability to unilaterally add an NDMA and/or cancer warning to the Zantac label (for both prescription and OTC). Had any Defendant attempted to add an NDMA warning to the Zantac label (either for prescription or OTC), the FDA would likely not have rejected it.

## VI.    Plaintiff-Specific Allegations

124.    Plaintiffs regularly took brand name prescription, generic, and/or OTC Zantac. Upon information and belief, these products were manufactured and sold by Defendants, including the Boehringer Ingelheim entities, during all relevant times.[38] *See* Exhibit A.

125.    Plaintiffs were diagnosed with various types of cancer, including but not limited to: stomach cancer, colorectal cancer, pancreatic cancer, kidney cancer, bladder cancer, prostate cancer, thyroid cancer, and liver cancer.

126.    Based on prevailing scientific evidence, exposure to Zantac (and the attendant NDMA) can cause cancer in humans.

127.    Plaintiffs' cancers were caused by ingestion of Zantac.

128.    Had any Defendant warned that Zantac could lead to exposure to NDMA or, in turn, cancer, Plaintiffs would not have taken Zantac.  Plaintiffs would not have taken ranitidine had Plaintiffs known of or been fully and adequately informed by Defendants, or by Plaintiffs' physicians of the true increased risks and serious dangers of taking the drug.

---

[38] The dates a particular Defendant manufactured Zantac do not capture the entire time period that its version of Zantac was available for consumption. For example, a Zantac pill manufactured in 2016 likely takes months or years before it eventually reaches store shelves and then a consumer. Further, then, it could be an additional months or years before that particular pill was ingested by a consumer or Plaintiff. Therefore, the mere fact that a Defendant ceased manufacturing Zantac in a given year does not absolve that Defendant from liability stemming from Plaintiffs' ingestion of Zantac in the following years.

## VIII.    Exemplary/ Punitive Damages Allegations.

129.    Defendants' conduct as alleged herein was done with intentional and/or reckless disregard for human life, oppression, and malice. Defendants were fully aware of the safety risks of Zantac, particularly the carcinogenic potential of Zantac as it transforms into NDMA within the chemical environment of the human body. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead consumers.

130.    This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing consumers that Zantac was harmless to humans, and that full disclosure of the true risks of Zantac would limit the amount of money Defendants would make selling Zantac. Defendants' object was accomplished not only through their misleading label, but through a comprehensive scheme of selective misleading research and testing, false advertising, and deceptive omissions as more fully alleged throughout this Complaint. Plaintiffs were denied the right to make an informed decision about whether to purchase and use Zantac, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiffs' rights.

131.    Accordingly, Plaintiffs request punitive damages against Defendants for the harms caused to Plaintiffs.

### TOLLING, DISCOVERY RULE, FRAUDULENT CONCEALMENT, ESTOPPEL

132.    Plaintiffs assert all applicable statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including estoppel, equitable tolling, delayed discovery, discovery rule and/or fraudulent concealment.

133.    Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Zantac. Defendants had a duty to disclose the true

34

character, quality, and nature of Zantac because this was non-public information over which Defendants continue to have control. Defendants knew that this information was not available to Plaintiffs, Plaintiffs' medical providers, and/or health facilities, yet Defendants failed to disclose the information to the public, including to the Plaintiffs.

134. The expiration of any applicable statute of limitations has been equitably tolled by reason of Defendants' misrepresentations and concealment. Through affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiffs the true risks associated with use of Zantac. Due to Defendants' acts and omissions, Plaintiffs' physicians were unaware of the increased risk of multiple types of cancer associated with the use of ranitidine due to its degradation into NDMA. Plaintiffs' physicians did not warn Plaintiffs of the true risks of ingesting Zantac including the increased risk of cancer. During the limitations period, Plaintiffs could not reasonably have known or learned through reasonable diligence that Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

135. Within the time period of any applicable statute of limitations, Plaintiffs could not have discovered through the exercise of reasonable diligence that exposure to Zantac is injurious to human health. Plaintiffs' physicians did not warn Plaintiffs that the true risks of ingesting NDMA in ranitidine included the increased risk of cancer. Plaintiffs and/or their representatives did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of Zantac, nor would a reasonable and diligent investigation by Plaintiffs and/or their representatives have disclosed that Zantac would cause Plaintiffs' injuries and/or deaths.

136. Despite acting with reasonable diligence, Plaintiffs did not learn of the link between

35

their cancers and ranitidine exposure until a time within the statute of limitations for filing of Plaintiffs' claims.

137.    Plaintiffs bring the following causes of action pursuant to the Connecticut Product Liability Act §52 572m, *et seq*., various applicable state products liability statutes for the states listed in Exhibit A, and applicable common law for the states listed in Exhibit A.

## CAUSES OF ACTION

### COUNT I: NEGLIGENCE – DESIGN

138.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

139.    Defendants were responsible for the manufacture, packaging, marketing, shipping, storage, handling, distribution and/or selling of prescription and OTC Zantac purchased and ingested by Plaintiffs.

140.    Defendants, directly or indirectly, caused Zantac to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and/or sold Zantac within the State of Connecticut and throughout the United States.

141.    At all relevant times, Defendants had a duty to exercise reasonable care in the manufacture, marketing, advertisement, supply, storage, transport, packaging, sale, and/or distribution of Zantac products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

142.    Defendants' duty of care owed to consumers, healthcare providers and the general public included providing accurate, true, and correct information concerning the risks of using

Zantac, the risks of improper storage and exposure to heat and humidity, and appropriate, complete, and accurate warnings concerning the potential adverse effects of Zantac and, in particular, its ability to degrade into the carcinogenic compound NDMA under certain conditions.

143.    At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Zantac and, specifically, the carcinogenic properties of NDMA when these products were ingested.

144.    Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of Zantac could cause Plaintiffs' injuries, and thus, created a dangerous and unreasonable risk of injury to the users of these products. Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers were unaware of the risks and the magnitude of the risks associated with use of Zantac.

131.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, storage, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Zantac products, in that Defendants manufactured and produced defective Zantac which carries the potential to transform into the carcinogenic compound NDMA; knew or had reason to know of the defects inherent in their products; knew or had reason to know that a user's or consumer's storage and handling and use of the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries.

145.    Defendants were negligent in their promotion of Zantac, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Zantac, including the internet, television, print advertisements, etc. Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty

to disclose the truth about the risks associated with Zantac in their promotional efforts, outside of the context of labeling.

146.    Readily available testing methods revealed the dangers of Defendants' Zantac and ranitidine-containing products. For example, gas chromatography-mass spectrometry, the technique Valisure employed in 2019 to identify NDMA forming in ranitidine, was a widely available, cost-effective, industry-standard testing method. If this testing method had been used by Defendants to test Zantac and ranitidine, they could have determined that Zantac and ranitidine transform into NDMA when subjected to heat.

147.    No Defendant tested the effects of temperature, time, humidity, light, or other relevant storage or transportation conditions on the quantity of NDMA in ranitidine-containing products.

148.    Testing of the ranitidine molecule at any time would have revealed that hotter temperatures, longer time periods, and higher humidity each increases the amount of NDMA.

149.    Testing of the ranitidine molecule at any time also would have revealed that the typical temperature, time-period, and humidity that ranitidine-containing products were exposed to before being consumed resulted in dangerously high levels of NDMA.

150.    Defendants knew or should have known that ranitidine-containing products posed a grave risk of harm. The dangerous propensities of their products and the carcinogenic characteristics of NDMA as produced within the human body as a result of ingesting ranitidine, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold the product, but were not known to end users and consumers, including Plaintiffs.

151.    For example, Defendants knew that ranitidine had an inherent risk of degrading into NDMA because it has both a nitroso (N) and dimethylamine (DMA), which are all the ingredients needed to form NDMA.

152.    Defendants also were on notice of the need to test and fully evaluate the carcinogenicity of ranitidine based on the research performed by Dr. de Flora and GSK scientists in the 1980s, which would have alerted the reasonable manufacturer of Zantac and/or ranitidine to beware of the potential for NDMA to form in the drug and/or in the human body.

153.    Any of a variety of tests for NDMA would have sparked quick action. The FDA initiated a voluntary recall only seven months after Valisure first publicized its NDMA testing results in September 2019. If any Defendant had performed and publicized a similar test at an earlier time, the FDA and broader market would have acted as quickly and decisively as happened in 2019, since the dangerous properties of NDMA were widely understood at all relevant times.

154.    Defendants, directly or indirectly, manufactured, labeled, packaged, tested, and/or sold ranitidine-containing products that were used by Plaintiffs.

155.    Defendants had a duty to warn Plaintiffs of the risk of cancer from exposure to NDMA in Zantac.

156.    Defendants had a duty to impose safe expiration dates and storage conditions that would decrease the risk of harm to Plaintiffs. None did.

157.    At all relevant times, Defendants had reason to know of the need for testing to reveal the hazards and dangers of Zantac and ranitidine and, specifically, the carcinogenic properties of NDMA when ranitidine-containing products are ingested and/or the elevated levels of NDMA that occurs when ranitidine-containing products are transported and stored based on studies conducted in the 1980s. Despite their ability and means to investigate, study, and test the

39

products and to provide adequate warnings and instructions of the risk and safe expiration and

storage conditions, Defendants failed to do so. Indeed, Defendants wrongfully concealed

information and further made false and/or misleading statements concerning the safety and use of

Zantac.

158.   Defendants' negligence included:

a.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Zantac without thorough and adequate pre- and post-market testing;

b.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Zantac while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of Zantac and the carcinogenic potential of NDMA as created in the human body as a result of ingesting Zantac, and, consequently, the risk of serious harm associated with human use of Zantac;

c.   Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Zantac products were safe for their intended consumer use;

d.   Failing to use reasonable and prudent care in testing, research, manufacture, storage, transport and development of Zantac products so as to avoid the risk of serious harm associated with the prevalent use of Zantac products;

e.   Failing to design and manufacture Zantac so as to ensure it was at least as safe and effective as other medications on the market intended to treat the same symptoms;

f.   Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use Zantac products;

g.   Failing to disclose to Plaintiffs, users/consumers, healthcare providers and the general public that use of Zantac presented significant risks of cancer and other grave illnesses;

h.   Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative medications available to Plaintiffs and other consumers;

i.   Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Zantac products;

j.   Representing that their products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

40

k.  Declining to make or propose any changes to the products' labeling or other promotional materials that would alert consumers and the general public of the risks;

l.  Advertising, marketing, and recommending the use of the products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to NDMA in Zantac;

m.  Continuing to disseminate information to their consumers, which indicate or imply that Defendants' products are not unsafe for regular consumer use;

n.  Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous; and

o.  Shipping, storing, and handling of Zantac in a manner that subjected it to heat and humidity so that it generated high levels of NDMA.

159.    Defendants knew and/or should have known that foreseeable consumers, such as Plaintiffs, would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, storage, transport, and sale of Zantac.

160.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Zantac.

161.    Defendants' negligence was the proximate cause of Plaintiffs' injuries, i.e., absent Defendants' negligence, Plaintiffs would not have developed cancer.

162.    Defendants' conduct, as described above, was reckless and without regard for the safety of consumers including Plaintiffs herein. Defendants regularly risked the lives of consumers and users of their products, including Plaintiffs, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs of the risk of cancer from NDMA in Zantac, including warning or informing of appropriate conditions under which to store their products, the appropriate expiration dates, and the significant risks of seemingly harmless behavior such as storing ranitidine in a bathroom medicine cabinet where it would be regularly exposed to humidity.

163.    Defendants' conduct as alleged herein was done with reckless disregard for human

life, oppression, and malice.  Defendants were fully aware of the safety risks of Zantac, particularly its carcinogenic potential as it transforms into NDMA within the chemical environment of the human body and/or during transport and/or storage.  Nonetheless, Defendants deliberately crafted their label and marketing to mislead consumers.  This was not done accidentally or through some justifiable negligence.  Rather, Defendants knew they could profit by convincing consumers that Zantac was harmless to humans, and that full disclosure of the true risks would limit the amount of money Defendants would make selling the drugs.  Defendants' objective was accomplished not only through a misleading label, but through a comprehensive scheme of selective misleading research and testing, false advertising, and deceptive omissions as more fully alleged throughout this pleading.  Plaintiffs were denied the right to make an informed decision about whether to purchase and use Zantac, knowing the full risks attendant to that use.  Such conduct was done with conscious disregard of Plaintiffs' rights.

164.   Defendants' conduct, as described above, was willful, wanton, malicious and conducted with reckless disregard for the health and safety of users of Zantac products, including Plaintiffs.  Defendants' conduct warrants an award of punitive damages.

165.   As a direct and proximate result of Defendants negligently placing defective Zantac products into the stream of commerce, Plaintiffs suffered significant, serious, and permanent injury and or death, and Plaintiffs sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

166.   As a proximate result of Defendants negligently placing defective Zantac products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish, personal injury and/or death, and other damages.

167.    As a proximate result of Defendants negligently placing defective Zantac products into the stream of commerce, as alleged herein, Plaintiffs sustained loss of income, and loss of earning capacity.

## COUNT II: NEGLIGENCE—FAILURE TO WARN

168.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

169.    Ranitidine leads to NDMA exposure in the following ways: (1) the NDMA levels in ranitidine increase as the drug breaks down in the human digestive system and interacts with various enzymes in the human body; (2) the ranitidine molecule internally degrades to form NDMA, and the NDMA levels in the drug substance and the drug product increase over time under normal storage conditions, but more so with exposure to heat or humidity.

170.    NDMA is a potent carcinogen in humans.  Higher exposure to NDMA over longer time periods leads to even higher risks of cancer.

171.    To mitigate degradation of ranitidine into NDMA in the stomach, over time, and in the presence of heat or humidity, consumers could be warned:

    a.    To consume ranitidine shortly after manufacturing and to store it in a cool, dry place (e.g., not in a bathroom).  No ranitidine containing product contained this warning.

    b.    To consume ranitidine for only short periods of time.  No ranitidine-containing product warned that cancer could result from long-term ingestion of ranitidine.

    c.    Not to take ranitidine with or after meals or in combination with a high-nitrite diet. No ranitidine-containing product contained this warning.

    d.    To take ranitidine with Vitamin E or Vitamin C to inhibit nitrosation and the formation of NDMA in the stomach.  No ranitidine-containing product contained

43

this warning.

172.    To mitigate degradation of ranitidine into NDMA over time, and in the presence of heat or humidity, consumers should have been warned to consume ranitidine shortly after manufacturing. No ranitidine-containing product contained this warning.

173.    In fact, ranitidine-containing products had expiration dating periods of one or two years allowing accumulation of more and more unsafe levels of NDMA. A much shorter period of a matter of months would have ensured that ranitidine contained far lower levels of NDMA when consumed.

174.    In setting expiration and/or retest dates for their ranitidine-containing drugs, Defendants were required to take into consideration the real-world conditions the drugs would be exposed to, including the conditions under which the drugs would be stored and shipped. See 21 C.F.R. § 211.137.

175.    A manufacturer has a duty of reasonable care to provide an adequate warning about known risks. The risk posed from NDMA in Zantac was known and/or knowable by Defendants. Defendants' duty of care owed to consumers and the general public included the duty to provide accurate, true, and correct information concerning the risks of using ranitidine-containing products and appropriate, complete, and accurate warnings concerning the potential adverse effects of ranitidine-containing products and, in particular, its ability to transform into the carcinogenic compound NDMA. Defendants had a continuing duty to provide appropriate and accurate warnings and precautions.

176.    Defendants, as manufacturers and sellers of pharmaceutical medication, are held to the knowledge of an expert in the field.

177.    At all relevant times, Defendants negligently designed, manufactured, tested,

44

marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings concerning the dangerous characteristics of Zantac and NDMA. These actions were under the ultimate control and supervision of Defendants.

178.    At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of ranitidine-containing products and, specifically, the carcinogenic properties of NDMA when ranitidine is ingested. Defendants knew or should have known about each of these risks in time to warn consumers.

179.    Even though Defendants knew or should have known that Zantac posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to ranitidine-containing products. The dangerous propensities of ranitidine-containing products and the carcinogenic characteristics of NDMA, as described above, were known to Defendants, or scientifically knowable to Manufacturer Defendants through appropriate research and testing by known methods, at the time they manufactured, marketed, distributed, supplied, or sold the products, but were not known to end users and consumers, including Plaintiffs.

180.    Defendants negligently failed to warn and have wrongfully concealed information concerning the dangerous level of NDMA in ranitidine-containing products, and further, have made false and/or misleading statements concerning the safety of Zantac.

181.    At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of Zantac because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

45

182.    At various points in time, Defendants possessed new information or new analyses of existing information that empowered them unilaterally to change the warnings and precautions section of their ranitidine-containing products' label.

183.    At all relevant times, Defendants negligently failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their products and to those who would foreseeably use or be harmed by Zantac.

184.    Each Defendant breached this duty for the ranitidine-containing products it manufactured, marketed, and sold. The warnings included on each ranitidine-containing product were unreasonably inadequate because they did not warn of the risk of cancer when taken over long periods, when stored or transported under humid conditions, when stored or transported under hot conditions, when consumed with a high-nitrite diet, and when consumed long after manufacture. Plaintiffs and/or their doctors would have read and heeded these warnings. As a result, Plaintiffs would not have ingested Zantac and would not have developed cancer or otherwise been harmed by exposure to NDMA in these products.

185.    Despite this ability, Defendants failed to warn of the risks of NDMA in the warnings and precautions section of their ranitidine-containing products' label.

186.    Plaintiffs were exposed to Defendants' ranitidine-containing products without knowledge of their dangerous characteristics. Plaintiffs could not have reasonably discovered the risks associated with ranitidine-containing products prior to or at the time Plaintiffs consumed the drugs. Plaintiffs and Plaintiffs' physicians relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

187.    At all relevant times, Plaintiffs used and/or were exposed to Defendants' ranitidine-

containing products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

188.    Defendants knew or should have known that the minimal warnings disseminated with their ranitidine-containing products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses. The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to avoid using the drug. Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to ranitidine; continued to aggressively promote the efficacy of ranitidine-containing products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting Zantac.

189.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their ranitidine-containing products on the warnings and precautions section of their products' labels, Plaintiffs could have avoided the risk of Plaintiffs developing cancer and could have obtained or used alternative medication. However, as a result of Defendants' concealment of the dangers posed by their ranitidine-containing products, Plaintiffs were not alerted, and so could not avert Plaintiffs' injuries.

190.    Manufacturer Defendants' conduct, as described above, was reckless.

191.    Manufacturer Defendants risked the lives of consumers and users of their products, including Plaintiffs, with knowledge of the safety problems associated with ranitidine-containing products, and suppressed this knowledge from the public. Defendants made conscious decisions not to warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

192.    Defendants' lack of adequate warnings and instructions in the warnings and precautions section of their ranitidine-containing products' labels were a substantial factor in causing Plaintiffs' injuries.

193.    As a direct and proximate result of Defendants' failure to provide an adequate warning of the risks of ranitidine-containing products, Plaintiffs suffered injuries and/or death, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to, past and future medical expenses, lost income, funeral expenses, and other damages.

## COUNT III: NEGLIGENT STORAGE AND TRANSPORTATION

194.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

195.    As previously alleged, ranitidine degrades into NDMA more quickly at higher temperatures, at higher humidity levels, and under other poor storage or handling conditions.

196.    Defendants were aware of the need to maintain sensitive pharmaceutical drugs under proper shipping and storage conditions, and that maintaining the highest safety techniques is best for the consumer. Pharmaceutical companies are well aware of the importance of precise temperature control down to the degree, and advertise on their ability to provide precise, quality service. More precise, colder transportation is, of course, more expensive than less precise, warmer

transportation.

197.    Testing of the quantity of NDMA in ranitidine performed to date has shown substantial variation among different batches. Some ranitidine has significantly more NDMA when tested.

198.    NDMA forms due to chemical reactions in the human body, and also from degradation before consumption (principally heat, humidity, or time). Testing is performed before consumption and the age of the ranitidine is documented, so neither time nor degradation in the body should produce substantial variation. The best inference must be that substantial variation in heat and humidity is causing differing amounts of NDMA to form.

199.    Different ranitidine-containing products listed slightly different storage and transportation requirements.

200.    Defendants systematically exposed ranitidine to excessive levels of heat and humidity that violated the instructions on the products' labels.

201.    Defendants failed to implement rigorous policies to ensure substantial compliance with the heat and humidity requirements on product labels. This failure led to widespread noncompliance.

202.    For example, Defendants shipped ranitidine-containing products through the mail. This method of transportation—whether through the United States Postal Service or large common carriers such as FedEx and UPS—does not guarantee controlled temperature or humidity. Because of Defendants' choice to use or allow this method of transportation, ranitidine-containing products shipped through the mail were systematically subject to excessive heat or humidity on days when the weather was hot or humid.

203.    Defendants, directly or indirectly, transported, stored, handled, and/or sold

ranitidine-containing products that were used by Plaintiffs.

204.    At all relevant times, Defendants, had a duty to exercise reasonable care in the storage and transportation of ranitidine-containing products to ensure the products were not unreasonably dangerous to consumers and users.

205.    Defendants breached this duty by failing to implement or enforce policies to ensure ranitidine-containing products remained free from excessive heat and humidity, as required both by the duty of reasonable care and the label.

206.    At all relevant times, Defendants knew or should have known of the need for storing and transporting ranitidine-containing products within the labeled temperature range and at low humidity. Yet, Defendants ignored this risk. They did not ensure ranitidine-containing products were stored at low humidity or within the temperature range on the label. Instead, some ranitidine was subjected to excessive humidity and heat during storage, transportation, and shipping which caused the drug to degrade leading to the formation of excessive levels of NDMA.

207.    Ignoring the risks of NDMA forming was unreasonable and reckless.

208.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to ranitidine-containing products.

209.    Defendants' negligence was a substantial factor in causing Plaintiffs' injuries.

210.    As a direct and proximate result of Defendants' failure to store and transport ranitidine-containing products properly, Plaintiffs have suffered injuries and/or death, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, funeral expenses, and other damages.

211.    As a direct and proximate result of these systematic failures, excessive levels of

NDMA formed in the ranitidine-containing products the Defendants handled, stored and sold. These high levels of NDMA caused Plaintiffs' injuries and/or death.

## COUNT VI: NEGLIGENT MISREPRESENTATION

212.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

213.    The products complained of, Zantac Products, were designed, manufactured, advertised, marketed, distributed, and/or sold by the Defendants, which Plaintiffs regularly used and ingested.

214.    At all relevant times, the Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold their Zantac Products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because Zantac Products does not contain adequate warnings or instructions concerning the dangerous characteristics of ranitidine and NDMA.   These actions were under the ultimate control and supervision of the Defendants.

215.    Defendants represented to Plaintiffs via the media, advertising, website, social media, packaging, and promotions, among other misrepresentations described herein that:

a.    the Zantac Products/ranitidine were both safe and effective for the lifetime of the product, when in fact, the drug contains unsafe levels of NDMA far in excess of the 96ng limit that increases at various points during the shipping, handling, storage, and consumption phases and as the product ages;

b.    consumption of Zantac Products/ranitidine would not result in excessive amounts of NDMA being formed in their bodies;

c.    the levels of NDMA in Zantac Products have no practical clinical significance; and

d.    Zantac Products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose.

216.    These representations were false. Because of the unsafe levels of NDMA in Zantac Products, the drug presented an unacceptable risk of causing cancer. Zantac Products are so unsafe that the FDA was compelled to order the immediate withdrawal of all ranitidine-containing products on April 1, 2020.

217.    Defendants knew that their Zantac Products would be used by their customers, such as Plaintiffs, without inspection for defects and that any such inspection would not have advised Plaintiffs of the fact that the Defendants' Zantac Products could cause the injuries which she suffered. Such facts made the Defendants' Zantac Products inherently and unreasonably dangerous in that Plaintiffs were not apprised of, could not and would not contemplate the danger and/or the extent of the danger of contracting colorectal and uterine cancer and the associated injuries and complications as a result of her exposure to the Defendants' Zantac Products and NDMA.

218.    Defendants knew or should have known these representations were false and negligently made them without regard for their truth.

219.    Defendants had a duty to accurately provide this information to Plaintiffs. In concealing this information from Plaintiffs, Defendants breached their duty. Defendants also gained financially from, and as a result of their breach.

220.    Defendants· intended for Plaintiffs and/or their physician(s) to rely on these representations.

221.    Each of these misrepresentations were material at the time they were made. In particular, each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase or consume Zantac Products

222.    Plaintiffs relied on the Defendants' statements regarding the Zantac Products by using and ingesting the Manufacturer Defendants' Zantac Products in the manner in which they were intended or reasonably foreseeable to the Defendants.

223.    Plaintiffs would not have regularly used and ingested Zantac Products if Defendants did not make the foregoing misrepresentations.

224.    Defendants' acts and omissions as described herein were committed in reckless disregard of Plaintiffs' rights, interests, and well-being to enrich Defendants.

225.    Each of the Defendants owed a duty to Plaintiffs and the general public to make accurate and truthful representations regarding Zantac Products, and the Defendants breached their duty, thereby causing Plaintiffs to suffer harm.

226.    Plaintiffs were exposed to the Defendants' products whenever they took Zantac Products. Each exposure to Defendants' Zantac Products caused Plaintiffs to be exposed to additional and accumulating NDMA, which then resulted in and directly caused Plaintiffs to suffer severe bodily injuries, specifically various types of cancer. Each exposure to Zantac Products was harmful and caused or contributed substantially to Plaintiffs' injuries and/or death.

227.    As a direct and proximate result of the Defendants' negligent misrepresentations concerning their Zantac Products/ranitidine-containing products, Plaintiffs have suffered injuries and/or death, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, funeral expenses, and other damages.

## COUNT V: STRICT LIABILITY – DESIGN DEFECT

228.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

229. At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and/or promoting ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing ranitidine-containing products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

230. At all relevant times, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, stored, sold, and distributed the ranitidine-containing products used by Plaintiffs, as described herein.

231. At all relevant times, Defendants' ranitidine-containing products reached the intended consumers, handlers, and users or other persons coming into contact with these products within this State and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

232. Defendants' ranitidine-containing products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and/or marketed by Defendants were defective in design because they were unreasonably dangerous, and did not contain adequate warnings or instructions concerning the dangerous characteristics of ranitidine and NDMA. Defendants' ranitidine-containing products were therefore unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

233. At all relevant times, Defendants' ranitidine-containing products, as designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by Defendants were defective in design and formulation, in one or more of the following ways:

54

a.   Defendants' ranitidine-containing products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer when used in a reasonably anticipated manner;

b.   Defendants' ranitidine-containing products were not reasonably safe when used in a reasonably anticipated or intended manner;

c.   Defendants did not sufficiently test, investigate, or study their ranitidine-containing products and, specifically, the ability for ranitidine to transform into the carcinogenic compound NDMA within the human body;

d.   Defendants did not sufficiently test, investigate, or study their ranitidine-containing products and, specifically, the stability of ranitidine and the ability for ranitidine-containing products to develop increasing levels of NDMA over time under anticipated and expected storage and handling conditions;

e.   Defendants failed to provide accurate expiration dates on the product label;

f.   Defendants failed to package their ranitidine-containing products in a manner which would have preserved the safety, efficacy, quality, and purity of the product;

g.   Defendants failed to provide accurate instructions concerning the stability of the drug, including failing to provide accurate information about proper temperature and light conditions for storage of the drug;

h.   Defendants knew or should have known at the time of marketing ranitidine-containing products that exposure to ranitidine could result in cancer and other severe illnesses and injuries;

i.   Defendants did not conduct adequate post-marketing surveillance of their ranitidine-containing products;

j.   Defendants did not conduct adequate stability testing of their product to ascertain shelf life, expiration, and proper storage, heat, and light specifications; and

k.   Defendants could have employed safer alternative designs and formulations.

234.   At all relevant times, Defendants knew or had reason to know that Zantac products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

235.   At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of ranitidine because they knew or should have

55

known of the unreasonable risks of harm associated with the use of and/or exposure to such products. Despite this ability, Defendants failed to warn Plaintiffs of the risks of NDMA and in the warnings and precautions section of their ranitidine-containing products' label.

236.    At various points in time, Defendants possessed new information or new analyses of existing information that empowered them unilaterally to change the warnings and precautions section of their ranitidine-containing products' label.

237.    Plaintiffs used and were exposed to Defendants' ranitidine-containing products without knowledge of Zantac's dangerous characteristics.

238.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendants' ranitidine-containing products in an intended or reasonably foreseeable manner without knowledge of Zantac's dangerous characteristics.

239.    Plaintiffs did not know and could not reasonably have discovered the defects and risks associated with ranitidine-containing products before or at the time of exposure due to the Defendants' suppression or obfuscation of scientific information linking Zantac to cancer.

240.    The harm caused by Defendants' ranitidine-containing products far outweighed their benefit, rendering Defendants' product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' ranitidine-containing products were and are more dangerous than alternative products, and Defendants could have designed ranitidine-containing products to make them less dangerous. Indeed, at the time Defendants designed ranitidine-containing products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

241.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their ranitidine-containing products on the

warnings and precautions section of their products' labels, Plaintiffs could and would have avoided the risk of developing cancer and could and would have obtained alternative medication.

242.    Defendants' defective design of ranitidine-containing products was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users of the Zantac products, including Plaintiffs. Defendants risked the lives of consumers and users of their products, including Plaintiffs, with knowledge of the safety problems associated with ranitidine-containing products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

243.    The defects in Defendants' ranitidine-containing products were substantial and contributing factors in causing Plaintiffs' injuries and/or death, and, but for Defendants' misconduct and omissions, Plaintiffs would not have sustained injuries and/or death.

244.    As a direct and proximate result of Defendants placing their defective ranitidine-containing products into the stream of commerce, and the resulting injuries, Plaintiffs sustained personal injuries and/or death, mental anguish, loss of income, loss of earning capacity, pecuniary loss, funeral expenses, and other damages which exceeds the jurisdictional minimum of this Court.

## COUNT VI: STRICT LIABILITY – FAILURE TO WARN

245.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

246.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and/or promoting ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the proper expiration

date of the product nor the dangerous characteristics of ranitidine and NDMA. These actions were under the ultimate control and supervision of Defendants.

247.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, stored, transported, sold, and/or otherwise released into the stream of commerce Zantac products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, and therefore had a continuing duty to warn of the risks associated with the use of Zantac products.

248.    Defendants also had a continuing duty to provide appropriate and accurate instructions regarding the proper expiration and retest dates, as well as the packaging, storage and handling or ranitidine.

249.    Defendants, as a manufacturer and seller of pharmaceutical medications, are held to the knowledge of an expert in the field.

250.    At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of ranitidine-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

251.    At various points in time, Defendants possessed new information or new analyses of existing information that empowered them unilaterally to change the warnings and precautions section of their Zantac products' label.

252.    At all relevant times, Defendants failed and deliberately refused to investigate, study, test, promote the safety of, or minimize the dangers to users and consumers of their ranitidine-containing products and to those who would foreseeably use or be harmed by Defendants' ranitidine-containing products, including Plaintiffs.

253.    Even though Defendants knew or should have known that ranitidine posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of their products and the carcinogenic characteristics of NDMA as produced within the human body as a result of ingesting ranitidine, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they manufactured, distributed, supplied or sold the product, and were not known to end users and consumers, such as Plaintiffs.

254.    To mitigate degradation of ranitidine into NDMA over time, and in the presence of heat or humidity, consumers should have been warned to consume ranitidine shortly after manufacturing.  No ranitidine-containing product contained this warning.

255.    In fact, ranitidine-containing products had expiration dating periods of one or two years allowing accumulation of more and more unsafe levels of NDMA.  A much shorter period of a matter of months would have ensured that ranitidine contained far lower levels of NDMA when consumed.

256.    In setting expiration and/or retest dates for their ranitidine-containing drugs, Defendants were required to take into consideration the real-world conditions the drugs would be exposed to, including the conditions under which the drugs would be stored and shipped.  See 21 C.F.R. § 211.137.

257.    In setting expiration and/or retest dates for their ranitidine-containing drugs, Defendants were required to base those dates on stability testing, which in turn must account for storage conditions. 21 C.F.R. § 211.166.

258.    Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn

59

consumers (i.e., the reasonably foreseeable users) of the risks of exposure to their products. Defendants have wrongfully concealed information concerning the dangerous nature of ranitidine-containing products, the potential for ingested ranitidine to transform into the carcinogenic NDMA compound, and further, have made false and/or misleading statements concerning the safety of ranitidine-containing products.

259.    At all relevant times, Defendants' ranitidine-containing products reached the intended consumers, handlers, and users, or other persons coming into contact with these products within this State and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

260.    Plaintiffs were exposed to Defendants' ranitidine-containing products without knowledge of their dangerous characteristics.

261.    At all relevant times, Plaintiffs used Defendants' ranitidine-containing products for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

262.    Plaintiffs and/or their personal representatives did not discover and could not have reasonably discovered the defects and risks associated with ranitidine-containing products prior to or at the time of Plaintiffs consuming them. Plaintiffs and/or their personal representatives relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

263.    Defendants knew or should have known that the minimal warnings disseminated with their ranitidine-containing products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and

instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses.

264.    The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Defendants: disseminated information that was inaccurate, false, and misleading; failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to ranitidine; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting ranitidine-containing products.

265.    This alleged failure to warn is not limited to the information contained on ranitidine-containing products' labeling. The Defendants should have disclosed the known risks associated with Zantac and ranitidine-containing products through other non-labeling mediums (i.e., promotion, advertisements, public service announcements, and/or public information sources), but the Defendants did not disclose these known risks through any medium.

266.    Defendants are liable to Plaintiffs for injuries caused by their negligent, willful or reckless conduct, as described above. Defendants risked the lives of consumers and users of their products, including Plaintiffs, by consciously deciding not to warn or inform physicians, patients and the public of known safety problems associated with ranitidine-containing products.

267.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their ranitidine-containing products, Plaintiffs could have avoided the risk of developing injuries and/or death and could have obtained or used

61

alternative medication.

268.    As a direct and proximate result of Defendants placing their defective ranitidine-containing products into the stream of commerce, and the resulting injuries, Plaintiffs sustained personal injuries and/or death, mental anguish, loss of income, loss of earning capacity, pecuniary loss, funeral expenses, and other damages which exceeds the jurisdictional minimum of this Court.

## COUNT VII: BREACH OF EXPRESS WARRANTIES

269.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

270.    At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing ranitidine-containing products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

271.    Defendants had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of ranitidine-containing products, including ranitidine syrup, including a duty to:

    a. ensure that their products did not cause the user unreasonably dangerous side effects;

    b. warn of dangerous and potentially fatal side effects;

    c. disclose adverse material facts, such as the true risks associated with the use of and exposure to ranitidine, when making representations to the FDA, consumers and the general public, including Plaintiff; and

    d. set proper expiration dates and storage temperatures and disclose the adverse consequences should ranitidine not be stored properly.

272.    As alleged throughout this pleading, the ability of Defendants to properly disclose those risks associated with its drugs are not limited to representations made on the labeling.

273.    At all relevant times, Defendants expressly represented and warranted to the purchasers of their products, by and through statements made by Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that ranitidine-containing products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendants advertised, labeled, marketed, and promoted its products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its ranitidine-containing products would conform to the representations.

274.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to ranitidine. Defendants knew and/or should have known that the risks expressly included in the warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendants expressly represented that its brand OTC ranitidine 150mg tablets were safe and effective, that it was safe and effective for use by individuals such as Plaintiffs, and/or that it was safe and effective as consumer medication.

275.    The representations about brand OTC ranitidine 150mg tablets ranitidine, as set forth herein, contained, or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

276.    Defendants placed brand OTC ranitidine 150mg tablets into the stream of commerce for sale and recommended its use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the ingestion of improperly stored ranitidine.

277.    Defendants breached these warranties because, among other things, ranitidine products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendants breached the warranties in the following ways:

a. Defendants represented through their labeling, advertising, and marketing materials that its products were safe, and intentionally withheld and concealed information about the risks of serious injury associated with improper storage and handling of use ranitidine; and

b. Defendants represented that its products were safe for use and intentionally concealed information that demonstrated that ranitidine, by transforming into NDMA when improperly stored or handled, had carcinogenic properties, and that its products, therefore, were not safer than alternatives available on the market.

278.    Plaintiffs detrimentally relied on the express warranties and representations of Defendants concerning the safety and/or risk profile of ranitidine in deciding to purchase the product. Plaintiffs reasonably relied upon Defendants to disclose known defects, risks, dangers, and side effects of its products if not stored, shipped and handled properly. Plaintiffs would not have purchased brand OTC ranitidine tablets had Defendants properly disclosed the risks associated with the products, either through advertising, labeling, or any other form of disclosure.

279.    Defendants had sole access to material facts concerning the nature of the risks associated with their products, as expressly stated within their warnings and labels, and knew that consumers and users such as Plaintiffs could not have reasonably discovered that the risks expressly included in its warnings and labels were inadequate and inaccurate.

280.    Plaintiffs had no knowledge of, and could not reasonably have discovered, the falsity or incompleteness of Defendants' statements and representations concerning ranitidine.

281.    Plaintiffs used and/or were exposed to ranitidine as manufactured, tested, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of

commerce by Defendants.

282.    Had the labels, advertisements, or promotional material for its products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiffs' injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiffs could have avoided the injuries complained of herein.

283.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiffs have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

284.    As a proximate result of Defendants' breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish and other personal injury and/or death, and damages.

285.    As a proximate result of Defendants' breach of express warranty, as alleged herein, Plaintiffs sustained a loss of income and/or loss of earning capacity.

### COUNT VII: FRAUD

286.    Plaintiffs incorporate by reference every and every allegation of this Complaint as if fully stated herein.

287.    Defendants intentionally and/or with reckless disregard for the truth misrepresented to Plaintiffs materials facts regarding the safety and effectiveness of ranitidine.

288.    Defendants knew or recklessly disregarded the fact that these representations were false, yet made the deceitful representations to Plaintiffs.

289.    Defendants actively concealed information about the defects and dangers of ranitidine with the absence of due care such that Plaintiffs and the consuming public would rely on such information, or the absence of information, in selecting ranitidine as a treatment.

65

290.    The maker's knowledge of the falsity of the representation fundamentally supplies the element of "fraudulent utterance" required to make a misrepresentation actionable.

291.    Defendants made the misrepresentations alleged herein with the intent to induce consumers, like Plaintiffs, to take their ranitidine products.

292.    As a result of these false and deceitful representations made by Defendants, which Defendants knew to be untrue or for which Defendants recklessly disregarded the truth, Plaintiffs purchased and ingested Defendants' ranitidine products causing the significant injuries and harm described herein.

293.    As a direct and proximate result of the foregoing misrepresentations and deceitful intentions, Plaintiffs sustained serious injuries of a personal and pecuniary nature.  Plaintiffs suffered serious injuries, including cancer and permanent disability and disfigurement.  As a direct and proximate result of the foregoing misrepresentations and deceitful intentions, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses. Plaintiffs will also require additional medical and/or hospital care, attention, and services in the future.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, each Plaintiff requests that the Court enter an order or judgment against the Defendants, including the following:

A.    Actual or compensatory damages in such amount—and more than $15,000, exclusive of interest and costs—to be determined at trial and as provided by applicable law;

B.    Exemplary and punitive damages sufficient to punish and deter Defendants and

others from future wrongful practices;

C.    Costs, including reasonable attorneys' fees, court costs, and other litigation

expenses; and

D.    Such other and further relief as the Court deems just and proper.

Dated: July 29, 2022                    Respectfully submitted,

By:
Craig A. Raabe
Robert A. Izard
**IZARD KINDALL & RAABE LLP** (Juris 410725)
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel. 860-493-6292
craabe@ikrlaw.com
*Attorneys for Plaintiff*

Justin R. Parafinczuk (*pro hac vice* forthcoming)
John Bruegger (*pro hac vice* forthcoming)
Steven D. Resnick (*pro hac vice* forthcoming)
Breann Plasters (*pro hac vice* forthcoming)
**PARARINCZUK WOLF**
9050 Pines Blvd., Suite 450-02
Pembroke Pines, Florida 33024
Telephone: (361) 882-1612
jparafinczuk@parawolf.com
jbruegger@parawolf.com
sresnick@parawolf.com
bplasters@parawolf.com
*Attorneys for Plaintiff*

A TRUE COPY ATTEST
KEITH D. NIZIANKIEWICZ
CONNECTICUT STATE MARSHAL
INDIFFERENT PERSON

67

RETURN DATE: AUGUST 30, 2022

| | |
|---|---|
| BETH BACHER, PLAINTIFF | SUPERIOR COURT |
| REPRESENTATIVE FOR PAUL BACHER | |
| (DECEASED); ASHA ATKINS; ANTHONY | |
| BALDWIN; LASHAUNNA DENISE | JUDICIAL DISTRICT OF DANBURY |
| BANKS; NIEMA BAPTISTA; CALANTHE | |
| BATISTE; JASON BEHRENS; CHASITY | |
| BELLARD; JESSE BLAKE; WILLIAM | |
| BLOCK; JEFFREY BOLEN; | |
| CHRISTOPHER BROPHY, SR.; KENISHIA | JULY 29, 2022 |
| BUNDAGE; MAURICE CALHOUN; | |
| SONJA CHAMBERLAIN; STEPHEN | |
| CHAMPINE; LINDSEY CHARLES; | |
| DOUGLAS CHOUINARD; BILLIE JO | |
| CLEM; RON MAZUN COLLINS; | |
| CHAUNCEY CONWAY; FLORENCE | |
| COUCHIE; TRINA DAU; KENNETH | |
| DAVIS; ROGER ALLAN DEFRANG; | |
| RUSTY DELANEY; RANDY DERCKS; | |
| ALVESTER DONES; CHASTITY | |
| DOTSON; HORACE DOTY; TEDDY | |
| DOUCET; DETRIC DREWERY; CONNIE | |
| DUGDALE; HARRIS DUGGER; | |
| TANTASHA DUTYE; LAURA EDWARDS; | |
| LORI A EISCHEN; CINDY EKLUND; | |
| LAURA ELLIS; DARELL ENLOE; LILLIE | |
| EVANS; AUSTIN FERGUSON; DOLLIE | |
| FIELDS; WILLIAM LYNN FISHER; | |
| KEVIN HERBERT KAY FIVECOAIT; | |
| PAUL FLUESMEIER; EDWARD L | |
| FORREST; LEAH FRANCIS; VIOLA | |
| FRANCIS; MARK FRANKLIN; TAMARA | |
| FREDERICK; CELESTE FREEMAN; | |
| ROBERT FROMMER; | |
| TERRANCE GAINES; TRAVEON | |
| GAINES; LADORIS GALBERT; ROBERT | |
| GARDNER; LINDA GILL; MICHAEL | |
| GLIDDEN; JOHN GOINGS; JASON | |
| GOLDEN; ROY GOODMAN; JUSTIN | |
| GORHAM; DALE GRAHAM; CALANDRA | |
| GREY; MARIO GUALTIERI; ARNOLDO | |
| GUTIERREZ; MILDRED HAGGERTY; | |
| BRYTTNY HALL; DELLA HAMM; | |
| TREMIAN HAMPTON; ZACK HANSANA; | |

BRIDGETTE HARDY; ROBERT                    :
HARMAN;                                    :
                                           :
JOANN ADAMS, PLAINTIFF                     :
REPRESENTATIVE FOR ROBERT                  :
EUGENE ADAMS (DECEASED);                   :
                                           :
JOHN BAGACO, PLAINTIFF                     :
REPRESENTATIVE FOR JOAO BAGACO,            :
(DECEASED);                                :
                                           :
ILENE BARAJAS, PLAINTIFF                   :
REPRESENTATIVE FOR MARTIN                  :
BARAJAS, (DECEASED);                       :
                                           :
RICKY DOYLE, PLAINTIFF                     :
REPRESENTATIVE FOR ANITA                   :
BENNETE (DECEASED);                        :
                                           :
MARK BLEUER, PLAINTIFF                     :
REPRESENTATIVE FOR KAREN                   :
BLEUER (DECEASED);                         :
                                           :
JULIE RUDOLPH, PLAINTIFF                   :
REPRESENTATIVE FOR ANDREW                  :
BOISVERT (DECEASED);                       :
                                           :
DARLA BOOKER, PLAINTIFF                    :
REPRESENTATIVE FOR DOUGLAS                 :
LYDELL BOOKER (DECEASED);                  :
                                           :
JOSEPH BUCCERI, PLAINTIFF                  :
REPRESENTATIVE FOR BARBARA                 :
BUCCERI (DECEASED);                        :
                                           :
ROBBIE CAHOON, PLAINTIFF                   :
REPRESENTATIVE FOR DUSTY                   :
CAHOON (DECEASED);                         :
                                           :
SHERMECKA DUBOSE, PLAINTIFF               :
REPRESENTATIVE FOR PATRICIA                :
COBB (DECEASED);                           :
                                           :
TERESA GHOSIO, PLAINTIFF                   :
REPRESENTATIVE FOR                         :
SUSAN CALLARI (DECEASED);                  :

TRACIE CATO, PLAINTIFF                                    :
REPRESENTATIVE FOR SANDRA CATO              :
(DECEASED);                                                       :
                                                                          :
FORESTINE CLARK, PLAINTIFF                        :
REPRESENTATIVE FOR EDWARD                    :
CLARK (DECEASED);                                           :
                                                                          :
SONJA CONTRERAS, PLAINTIFF                       :
REPRESENTATIVE FOR ENRIQUE                     :
CONTRERAS (DECEASED);                               :
                                                                          :
JAQUELINE CORTEZ-BATEMAN,                      :
PLAINTIFF REPRESENTATIVE FOR
WILLIAM CORTEZ (DECEASED);                       :
                                                                          :
NICHOLAS CRISTINO, PLAINTIFF                   :
REPRESENTATIVE FOR FRANCIS                     :
CRISTINO (DECEASED);                                     :
                                                                          :
AARON CURRIE, PLAINTIFF                            :
REPRESENTATIVE FOR BONITA                       :
CURRIE (DECEASED);                                        :
                                                                          :
SUSAN VERBACK, PLAINTIFF                         :
REPRESENTATIVE FOR  VIRGINA                    :
CWIAKALA (DECEASED);                                  :
                                                                          :
DIANE DAHL, PLAINTIFF                                 :
REPRESENTATIVE FOR MICHAEL A.              :
DAHL SR. (DECEASED);                                      :
                                                                          :
DIANA DASENT, PLAINTIFF                            :
REPRESENTATIVE FOR MARY DASENT           :
(DECEASED);                                                       :
                                                                          :
JOANNE YOBAK, PLAINTIFF                          :
REPRESENTATIVE FOR RITA JANE                 :
DONOHUE (DECEASED);                                   :
                                                                          :
THOMAS ECCLES, PLAINTIFF                         :
REPRESENTATIVE FOR PATRICIA                   :
ECCLES (DECEASED);                                         :

DANA DUGAS, PLAINTIFF                               :

REPRESENTATIVE FOR BONNIE          :
EDWARDS (DECEASED);                :
                                   :
LILLIAN FEARS, PLAINTIFF           :
REPRSENTATIVE FOR WAYNE FEARS      :
(DECEASED);                        :
                                   :
LISA RICHIE, PLAINTIFF             :
REPRESENTATIVE FOR DANIEL MOLZ     :
(DECEASED);                        :
                                   :
                                   :
                *Plaintiffs*       :
                                   :
        V.                         :
                                   :
                                   :
BOEHRINGER INGELHEIM               :
PHARMACEUTICALS, INC.;             :
BOEHRINGER INGELHEIM               :
CORPORATION;                       :
BOEHRINGER INGELHEIM USA           :
CORPORATION;                       :
GLAXOSMITHKLINE, LLC;              :
GLAXOSMITHKLINE HOLDINGS           :
(AMERICAS), INC.;                  :
PFIZER, INC.;                      :
SANOFI-AVENTIS U.S. LLC;
SANOFI U.S. SERVICES, INC.

          *Defendants*

## STATEMENT OF AMOUNT IN DEMAND

Each Plaintiff demands an amount in excess of $15,000, exclusive of interest and costs.

Dated: July 29, 2022

Respectfully submitted,

By:

Craig A. Raabe
Robert A. Izard
**IZARD KINDALL & RAABE LLP** (Juris 410725)
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel. 860-493-6292
craabe@ikrlaw.com
*Attorneys for Plaintiff*


Justin R. Parafinczuk (*pro hac vice* forthcoming)
John Bruegger (*pro hac vice* forthcoming)
Steven D. Resnick (*pro hac vice* forthcoming)
Breann Plasters (*pro hac vice* forthcoming)
**PARARINCZUK WOLF**
9050 Pines Blvd., Suite 450-02
Pembroke Pines, Florida 33024
Telephone: (361) 882-1612
jparafinczuk@parawolf.com
jbruegger@parawolf.com
sresnick@parawolf.com
bplasters@parawolf.com
*Attorneys for Plaintiff*

A TRUE COPY ATTEST

KEITH D. NIZIANKIEWICZ
CONNECTICUT STATE MARSHAL
INDIFFERENT PERSON

72

# EXHIBIT A

| Plaintiff Last, First | Rep Last, First | State | Zantac Start Date | Zantac End Date | Date(s) of Diagnosis | Injury Type(s) |
|---|---|---|---|---|---|---|
| Bacher, Paul | Bacher, Beth | CT | 1/1/2000 | 1/1/2019 | 08/01/2019 | Lung Cancer |
| Atkins, Asha | | TX | 3/1/2013 | 9/1/2016 | 09/10/2016 | Stomach Cancer |
| Baldwin, Anthony | | OR | 6/1/2008 | 8/1/2012 | 08/15/2012 | Liver Cancer |
| Banks, LaShaunna | | KY | 1/1/2006 | 1/1/2019 | 12/01/2018 | Intestinal Cancer |
| Baptista, Niema | | CA | 2/1/2010 | 4/1/2012 | 04/01/2012 | Pancreatic Cancer |
| Batiste, Calanthe | | TX | 4/1/2013 | 6/1/2015 | 06/07/2015 | Stomach Cancer |
| Behrens, Jason | | SC | 1/1/2013 | 1/1/2019 | 05/16/2013 | Testicular Cancer |
| Beilard, Chasity | | TX | 3/1/2012 | 12/31/2014 | 12/01/2014 | Stomach Cancer |
| Blake, Jesse | | IL | 6/1/2009 | 5/1/2015 | 01/01/2015 | Bladder Cancer |
| Block, William | | ME | 9/14/2010 | 10/14/2012 | 01/01/2012 | Colorectal Cancer |
| Bolen, Jeffrey | | MI | 1/1/1998 | 1/1/2017 | 12/01/2019 | Kidney Cancer |
| Brophy, Christopher | | MD | 5/1/2009 | 5/1/2019 | 10/20/2016 | Prostate Cancer |
| Bundage, Kenishia | | TX | 4/1/2011 | 6/1/2014 | 06/01/2014 | Stomach Cancer |
| Calhoun, Maurice | | CA | 7/1/2013 | 3/1/2016 | 03/28/2016 | Stomach Cancer |
| Chamberlain, Sonja | | SD | 6/1/2011 | 9/1/2014 | 01/01/2014 | Stomach Cancer, Intestinal Cancer |
| Champine, Stephen | | WI | 10/1/2000 | 10/1/2010 | 08/01/2018 | Colorectal Cancer |
| Charles, Lindsey | | CA | 1/1/2013 | 1/1/2016 | 03/01/2016 | Stomach Cancer |
| Chouinard, Douglas | | WY | 1/1/2010 | 1/1/2015 | 04/01/2018 | Prostate Cancer |
| Clem, Billie | | VA | 3/1/2003 | 5/1/2019 | 01/01/2015, 11/01/2016 | Brain Cancer, Uterine Cancer |
| Collins, Ron | | WI | 1/1/2008 | 1/1/2011 | 06/01/2011 | Bladder Cancer |
| Conway, Chauncey | | OK | 1/1/2010 | 1/1/2016 | 01/01/2016 | Prostate Cancer |
| Couchie, Florence | | OH | 1/1/2000 | 1/1/2019 | 01/01/2013 | Breast Cancer |
| Dau, Trina | | WA | 1/1/2011 | 1/1/2014 | 09/01/2013 | Lung Cancer |
| Davis, Kenneth | | CA | 2/1/2010 | 4/1/2013 | 04/01/2013 | Bladder Cancer |
| DeFrang, Roger | | TX | 1/1/1996 | 1/1/2016 | 09/01/2014 | Colorectal Cancer |
| Delaney, Rusty | | LA | 1/1/2012 | 1/1/2020 | 10/09/2014 | Lung Cancer |
| Dercks, Randy | | WI | 1/1/2008 | 1/1/2011 | 07/01/2020 | Kidney Cancer |
| Dones, Alvester | | SC | 1/1/1984 | 1/1/2019 | 01/01/2010 | Kidney Cancer, Other Non-Cancer |
| Dotson, Chastity | | TX | 1/1/2012 | 7/1/2014 | 07/25/2014 | Stomach Cancer |
| Doty, Horace | | MI | 1/1/1984 | 1/1/2018 | 01/01/1999 | Kidney Cancer |
| Doucet, Teddy | | LA | 1/1/2009 | 1/1/2018 | 03/01/2017 | Prostate Cancer |
| Drewery, Detric | | TX | 4/1/2013 | 2/1/2016 | 02/01/2016 | Stomach / Intestinal Cancer |
| Dugdale, Connie | | OR | 1/1/2001 | 1/1/2018 | 12/01/2019 | Kidney Cancer |
| Dugger, Harris | | GA | 1/1/1998 | 1/1/2016 | 02/06/2020 | Prostate Cancer |

| Plaintiff Last, First | Rep Last, First | State | Zantac Start Date | Zantac End Date | Date(s) of Diagnosis | Injury Type(s) |
|---|---|---|---|---|---|---|
| Dutye, Tantasha | | CA | 7/1/2013 | 3/1/2016 | 03/28/2016 | Stomach / Intestinal Cancer |
| Edwards, Laura | | OH | 1/1/2012 | 3/6/2013 | 03/01/2013 | Kidney Cancer |
| Eischen, Lori | | MO | 1/1/1994 | 1/1/2012 | 11/01/2017 | Kidney Cancer |
| Eklund, Cindy | | ME | 1/1/2016 | 1/1/2019 | 01/01/2019 | Colorectal Cancer |
| Ellis, Laura | | MI | 1/1/1987 | 1/1/2020 | 01/01/2017 | Throat Cancer |
| Enloe, Darell | | MO | 1/1/2008 | 1/1/2012 | 01/01/2015 | Colorectal Cancer |
| Evans, Lillie | | IL | 1/1/2010 | 12/1/2013 | 01/01/2012 | Liver Cancer |
| Ferguson, Austin | | TX | 6/1/2011 | 4/1/2014 | 04/15/2014 | Bladder Cancer |
| Fields, Dollie | | NC | 1/1/2013 | 1/1/2016 | 10/03/2016 | Stomach Cancer |
| Fisher, William | | ID | 1/1/1996 | 1/1/2019 | 08/31/2016 | Kidney Cancer, Prostate Cancer |
| Fivecoait, Kevin | | OH | 1/1/2006 | 1/1/2008 | 08/01/2019, 07/01/2020 | Colorectal Cancer, Lung Cancer |
| Fluesmeier, Paul | | MO | 1/1/2010 | 1/1/2019 | 11/01/2015 | Prostate Cancer |
| Forrest, Edward | | IN | 1/1/2012 | 11/1/2018 | 11/01/2017 | Prostate Cancer |
| Francis, Leah | | TX | 2/1/2011 | 5/1/2013 | 05/15/2014 | Stomach Cancer |
| Francis, Viola | | TX | 2/1/2011 | 4/1/2014 | 04/15/2014 | Stomach Cancer |
| Franklin, Mark | | TX | 4/1/2011 | 4/1/2012 | 06/01/2013 | Bladder Cancer |
| Frederick, Tamara | | IA | 1/1/2010 | 1/1/2019 | 01/01/2015 | Lung Cancer |
| Freeman, Celeste | | TX | 7/1/2013 | 8/1/2015 | 08/01/2015 | Stomach Cancer |
| Frommer, Robert | | TX | 1/1/2006 | 1/1/2019 | 06/01/2007 | Prostate Cancer |
| Gaines, Terrance | | SC | 6/1/2008 | 1/1/2010 | 01/01/2010 | Esophageal / Throat / Nasal Cancer |
| Gaines, Traveon | | CA | 4/1/2011 | 4/1/2013 | 04/01/2013 | Bladder Cancer |
| Galbert, Ladoris | | TX | 4/1/2013 | 6/1/2016 | 06/15/2016 | Stomach Cancer |
| Gardner, Robert | | AL | 1/1/1990 | 1/1/2017 | 05/01/2017 | Colorectal Cancer |
| Gill, Linda | | MN | 1/1/2012 | 1/1/2017 | 02/01/2019 | Lung Cancer |
| Glidden, Michael | | VA | 1/1/1988 | 1/1/2020 | 01/01/2014 | Prostate Cancer |
| Goings, John | | TX | 1/1/2012 | 1/1/2018 | 01/01/2016 | Prostate Cancer |
| Golden, Jason | | WV | 1/1/2005 | 1/1/2018 | 08/01/2014 | Testicular Cancer |
| Goodman, Roy | | TX | 3/1/2013 | 4/1/2016 | 04/01/2016 | Stomach Cancer |
| Gorham, Justin | | DC | 1/1/2016 | 1/1/2017 | 03/01/2017 | Testicular Cancer |
| Graham, Dale | | VA | 1/1/1984 | 1/1/2019 | 12/01/2012 | Colorectal Cancer |
| Grey, Calandra | | TX | 7/1/2012 | 12/31/2015 | 12/01/2015 | Stomach Cancer |
| Gualtieri, Mario | | IL | 1/1/2014 | 1/1/2015 | 01/01/2016 | Lung Cancer |
| Gutierrez, Arnoldo | | TX | 2/1/2000 | 10/1/2019 | 10/03/2017 | Kidney Cancer |
| Haggerty, Mildred | | KS | 1/1/2014 | 12/31/2019 | 01/01/2019, 01/01/2018 | Colorectal Cancer, Cervical Cancer |
| Hall, Bryttny | | GA | 7/1/2013 | 3/1/2016 | 03/26/2016 | Stomach Cancer |

| Plaintiff Last, First | Rep Last, First | State | Zantac Start Date | Zantac End Date | Date(s) of Diagnosis | Injury Type(s) |
|---|---|---|---|---|---|---|
| Hamm, Della | | MO | 1/1/2008 | 1/1/2019 | 07/20/2019 | Ovarian Cancer, Colon Cancer |
| Hampton, Tremian | | NV | 5/1/2012 | 6/1/2015 | 06/14/2015 | Stomach Cancer |
| Hansana, Zack | | CA | 1/1/2015 | 1/1/2016 | 06/01/2016 | Intestinal Cancer, Lung Cancer, Small Intestine Cancer, Testicular Cancer |
| Hardy, Bridgette | | TX | 4/1/2013 | 6/1/2016 | 06/15/2016 | Stomach Cancer |
| Harman, Robert | | NY | 1/1/2008 | 1/1/2020 | 06/06/2021, 11/04/2021 | Esophageal /Throat Cancer, Thyroid Cancer |
| Adams, Robert | Adams, Joann | KY | 1/1/1990 | 12/1/2020 | 07/01/2017 | Colorectal Cancer |
| Bagaco, Joao | Bagaco, John | CA | 1/1/2002 | 12/1/2019 | 05/01/2017 | Lung Cancer |
| Barajas, Martin | Barajas, Ilene | CO | 11/1/2000 | 9/1/2017 | 01/01/2017 | Lung Cancer |
| Bennete, Anite | Doyle, Ricky | CA | 1/1/2000 | 1/1/2012 | 01/01/2009 | Intestinal Cancer |
| Bleuer, Karen | Bleuer, Mark | MI | 1/1/2006 | 1/1/2010 | 01/01/2010 | Kidney Cancer |
| Boisvert, Andrew | Rudolph, Julie | WY | 1/1/1991 | 1/1/2011 | 05/01/2009 | Colorectal Cancer |
| Booker, Douglas | Booker, Darla | MO | 5/1/2001 | 1/4/2011 | 09/01/2010 | Lung Cancer |
| Bucceri, Barbara | Bucceri, Joseph | MI | 1/1/2005 | 1/1/2015 | 01/01/2014 | Colorectal Cancer |
| Cahoon, Dusty | Cahoon, Robbie | TX | 1/1/2011 | 1/1/2014 | 06/01/2011 | Liver Cancer |
| Callari, Susan | Ghosio, Teresa | NY | 1/1/2015 | 12/1/2017 | 01/01/2018 | Colorectal Cancer |
| Cato, Sandra | Cato, Tracie | GA | 1/1/2009 | 7/1/2015 | 07/15/2015 | Stomach / Intestinal Cancer |
| Clark, Edward | Clark, Florestine | LA | 1/1/1997 | 1/1/2016 | 01/01/2000 | Prostate Cancer |
| Cobb, Patricia | Dubose, Shermecka | LA | 1/1/2015 | 1/1/2018 | 11/01/2019 | Lung Cancer |
| Contreras, Enrique | Contreras, Sonia | AZ | 1/1/2008 | 1/1/2018 | 03/04/2018 | Lung Cancer |
| Cortez, William | Cortez-Bateman, Jaqueline | MI | 1/1/1990 | 1/1/2008 | 04/01/2008 | Lung Cancer |
| Cristino, Francis | Cristino, Nicholas | OH | 1/1/1996 | 1/1/2010 | 02/01/2010 | Colorectal Cancer |
| Currie, Bonita | Currie, Aaron | OH | 1/1/1997 | 5/1/2018 | 01/01/2017 | Lung Cancer, Breast Cancer |
| Cwiakala, Virginia | Verback, Susan | IL | 1/1/2014 | 1/1/2018 | 09/14/2018 | Ovarian Cancer |
| Dahl, Michael | Dahl, Diane | MN | 1/1/2015 | 1/1/2016 | 05/01/2017 | Lung Cancer |
| Molz, Daniel | Richie, Lisa | AR | 1/1/2012 | 1/1/2016 | 01/01/2017 | Lung Cancer |
| Dasent, Mary | Dasent, Diana | NJ | 1/1/1990 | 1/1/2019 | 11/04/2019 | Gallbladder Cancer |
| Donohue, Rita | Yobak, Joanne | SC | 1/1/1996 | 7/8/2015 | 06/01/2015 | Intestinal Cancer |
| Eccles, Patricia | Eccles, Thomas | KY | 1/1/2000 | 1/1/2019 | 05/01/2018 | Lung Cancer |
| Edwards, Bonnie | Dugas, Dana | LA | 1/1/2000 | 1/1/2016 | 02/01/2015 | Lung Cancer |
| Fears, Wayne | Fears, Lillian | TN | 1/1/2000 | 2/1/2016 | 01/01/2012 | Prostate Cancer |